Geeen, J.
. The act of the legislature of 1833 referred to, extends the laws of the State over the Cherokee territory, only so far as to punish the crimes of murder, rape and larceny; leaving the Indians in the exercise of their own customs, and subject to their own laws, in all other respects.
*338 Several important questions are involved in the consi- . . , • , . , T , ,, deration oí this case, m relation to which 1 shall proceed to state my views.
The relations which exist between the civilized States of America, and the savage tribes which border upon them, or are included within their boundaries, are very peculiar. From the nature of the case, these relations must be, in many respects, dissimilar' from any thing that exists among the civilized States of Europe. In order to he properly understood, they must be considered, partly in reference to the natural rights of nations, and partly in reference to the character of the parties, the necessities of the case, and the policy which dictated the attitude originally taken, and the course since pursued by the parties respectively.
I will first consider what originally were the rights of of the rude nations, that were found by our ancestors upon this continent in reference to the civilized nations by whom it was discovered.
We know that the principle is well settled, “That discovery gave an exclusive right to extinguish the aboriginal right of occupation, either by conquest or purchase, and to assume such jurisdiction over the savages, as circumstances might require.” 8 Wheat.
But in relation to whom is it laid down, that this right exists? Not in relation to the aborigines themselves, surely, for it is impossible that one nation can address to another, which it is about to conquer, the language of justification, and say, “we have a right to do this.” Right and wrong must be predicated by some rule, in reference to which we determine the quality of the act. It never can be true in reference to A and B alone, that the one has a right to conquer the other. The very idea of the necessity of the conquest, presupposes resistance, and excludes the existence of right. The law of nature does not give one man a right to subdue another to his authority. Nor does the law of nations authorize one nation to *339 make war upon another, without just cause, and merely for the purpose of subduing that other to its dominion. But as against others, I may have a right to exercise dominion over my slave; so, as it regards other civilized nations, the discovering country has a “right to extinguish the aboriginal right of occupation, either by conquest or purchase.” Although, therefore, our ancestors, by discovery, obtained, as against other civilized nations of Europe, a right to conquer the Indian tribes, and subdue them under the jurisdiction and authority of the government-they were about to establish here; yet such subjugation would have been a wrong to the Indians, and wholly unauthorized by any principle of international law.
France might properly say to England, “So far as we are concerned, or our rights are to be affected, you have a right to conquer the savage tribes who inhabit the country you have discovered.” But France could not say to England, “The savage nations who inhabit the country you have discovered, have no rights, and you may justly extend your conquests over them, and bring them in subjection to your authority.” This would be going further than any writer on public law, so far as I know, has gone. But, on the contrary, “théy had natural rights, which . even the strong hand of power should respect and acknowledge;” among which was the right to a space of country amply sufficient to maintain them by actual cultivation of the soil,” and I will add, they had the right of self government, according to their own usages.
But, although I think the principle's above laid down are undeniably true, yét it does not follow, that the people of the United States have no legal and perfect right to the lands they inhabit. The fact, that the immense regions now composing the United States, were inhabited by wandering tribes of savages, that they traversed the forest in the chase, and wandered up and down the streams in their fishing excursions, and that they had temporary habitations, from which they removed as oc *340 casion required, could not be taken for a true and legal • r ii possession oi all that vast extent ol country. Vattel, b. 1, ch. 19, sec. 209.
The earth was created for the general benefit of its inhabitants, and it is ordained that man shall live by the sweat of his face. In order to sustain its vast population the earth must be cultivated; and it is manifestly unjust, that a comparatively small number of its inhabitants should claim an exclusive right to a large portion of its surface, merely because they have wandered over it in the chase, or beheld it from some mountain peak, to which they may have ascended in pursuit of game. Vattel, b. 1, sec. 81.
These tribes were in no want of the forests through which they wandered. If they had pursued honest labor for a support, instead of the idle life of hunting and fishing, a very small proportion of the extensive territories they usurped, would hate been amply sufficient for them. If, therefore, the people of Europe, too closely pent up, found land, of which these tribes were in no particular want, and of which they made, and were likely to make, no actual or constant use, they might lawfully possess it. Vattel, b. 1, ch. 19, sec. 209.
The conclusion, therefore, from these principles, is, that if, when the discoverers came here to possess a portion of the extensive territory which the Indians did not need, they had been resisted, and opposed by those tribes, it would have been lawful to have used force to repel such resistance.
Although it is an admitted principle, that civilized nations have a right to settle and plant colonies in new discovered countries, inhabited by eratic tribes, yet it does not follow as a consequence, that the discovering country has a right to exercise jurisdiction over such nations.. The principle from which this right to settle and plant colonies ni such countries (as has already been shown) is derived, is founded upon the fact, that the inhabitants *341 have not the right to usurp such extensive territories ° for , the mere purpose of fishing and hunting, and that consequently the discovering country has a. right to circumscribe them within narrower bounds, and take a part of such territory for the purpose of cultivation. But most clearly, the discovering country has not the right to appropriate the entire extent of the country discovered, to its own use. ' If that were so, there would be no force in the argument, by which the. right to appropriate a part of it, is maintained.
When it is said by Vattel, b. 1, sec. 81, “that those who still retain this idle life, usurp more extensive territories than they would have occasion for, were they to use honest labor, and^have therefore no reason to complain, if other nations, more laborious, came to possess a part;” the writer states the principle upon which the right of those to take a part is founded; and this statement also implies, if it mean any thing, that those others have no right to take the whole, and that they would have a right to take none, if the possessors held no more than they would have occasion for in the use of honest labor. But it is true, that if land enough be left for the barbarous tribe, and if a portion of its people choose to live within the bounds prescribed by the civilized State, in such case, jurisdiction over their persons would be the necessary consequence. But here, I do not mean the boundary which the discovering State prescribed, within which it intends that no other civilized nation shall exercise any right, but such bounds as may be prescribed, between the civilized State and the barbarous tribe.
For we have already seen, that in relation to the country discovered, the discoverer may have rights in reference to civilized nations, which do not exist in relation to those inhabiting the discovered country.
It was upon the foregoing principle that our ancestors acted, and upon which our government has continued to act, up to this time, in reference to the Indian tribes. *342 The charters of the crown of England, conferred upon those, to whom they were granted, the exclusive right to all the country included in them, as against all other civilized nations. But if one of those charters had included the whole territory which any given tribe could lawfully possess, it would not have conferred the right to drive them out by force, or to reduce them by force, to the dominion and jurisdiction of the colony. But still the charters were not mere blank paper, in reference to the Indians. For as the king of England had a right to take possession for his subjects, of so much of the discovered country, as the barbarous tribes had no provision for, his charters communicated the entire right to such part, and the fee simple to the remainder, subject to the Indian possessory title. While, therefore, it is true, that the “United States maintain, as all others have maintained, that discovery gave an exclusive right to extinguish the Indian title, by purchase or conquest;” (8 Wheat. 587,) it is equally true, that the inhabitants of one quarter of the globe, have no rightful original claims of dominion or property over the inhabitants of the other, nor could the discovery of a country, give the discoverer rights which annulled the pre-existing rights, of the ancient possessors. Worcester vs. Georgia.
The right to purchase would exist in all nations, but for the exclusion of that right, in consequence of the superior rights of the discoverer. So any nation might conquer the country, and thereby acquire dominion; but as the discoverer, by the discovery, acquires the entire right to the country, except that which exists in the ancient possessors, it is clear, that whenever their right ceases, the discoverer acquires it. Therefore, although conquest may give a right to the soil, and to dominion over the inhabitants, yet such rights cannot vest in another than the discovering nation, because of its pre-exist-ing rights.
Both the right of conquest and of purchase, in the *343 sense in which the court use the expression, in the case of Johnson vs. M’Intosh, are rights which exist m reference to other civilized nations, and not rights which exist in reference to the rude tribes that are discovered. By the right to purchase, cannot be intended the acquisition of such portions of the territory as the rude and idle tribes have no occasion for, because, as I understand the principle, “the more’ laborious” nations have a right to come and possess such part without paying for it, and even-against the will óf such tribes. The idea of a purchase can only be predicated .upon the existence of an agreement to sell, as well as to buy. But' as no one can be rightfully compelled to consent to sell, therefore,, the right to purchase can only mean an exclusive right to acquire the title whenever the possessors may wish to relinquish it. No other nation has a right to purchase from them; consequently, if a sale be made at all, the discovering nation only has a right to purchase. This exclusive right-to purchase, therefore, is not founded upon a denial of the right of the possessor to sell, but upon a denial of the right of any other to become the purchaser. It is like the right of conquest, a right which exists solely in the discoverer as against all other civilized nations.
These principles, which seem to me to be incontrovertibly established, have been recognized and acted on from the earliest discovery of North America.
The charters of the king of England were never regarded as giving right to the soil to the whole extent of the boundaries designated in them, to the subversion of the Indian possessory title. For the doctrines avowed in the bulls of the pope, to the Spanish and Portuguese discoverers, and which were practised upon in the settlement of South America, were never maintained by the English monarchs,.nor practised upon by the colonists from 'that country; but have been condemned by all Protestant writers, as alike subversive of justice, and abhorrent' to humanity. Dr. Robertson, in his history of *344 South America, (p. 56,) says, that Pope Alexander the YIth, who gave that country to Spam, was “a pontiff, infamous for every crime which disgraces humanity.” But while the discoverers of North America claimed an exclusive right to acquire the Indian possessory title, and as a consequence claimed the fee simple of the soil as being vested in them, yet the Indian right of occupancy was always acknowledged to exist to such portions of the country, as were designated by the treaties, for their hunting grounds. Within these limits they have exercised the right of self government, and all the attributes of sovereignty not relinquished in their partial summissions. Even the right to take part of the territory, and appropriate it to their own use, was not always enforced by the colonists. In some instances, the lands upon which the first settlements were made, were taken possession of with the consent of the Indians, and by virtue of a purchase from them. This was the case in the settlement of New England, by the Puritans, and afterwards in the settlement of Pennsylvania, by William Penn and his followers. But this course was rather the dictate of a humane and benevolent feeling, desirous of cultivating friendship with the Indians, than the result of any obligation imposed, by the principles of public law, in reference to those people. But after a boundary between the colonists and Indians had once been fixed and established by treaty, the ’Indians could not, lawfully, have been deprived of any of the lands designated therein for them, without their consent. Consequently, it was the constant practice to treat with them for additional cessions of land.
True, their lands might have been acquired by conquest. For although one nation cannot justly or lawfully make war upon another, for the mere purpose of subduing it to the dominion of the invader, yet it is settled, (8 Wheat. 543,) that “conquest gives a title which the courts of the conqueror cannot deny, whatever the private *345 and speculative opinions of individuals maybe, respecting the original justice of the claim which has been successfully asserted.”
Where a just and necessary war is provoked, those who provoke it, may lawfully be subdued to the dominion of the other nation, should it conquer and be dispossessed of the soil at the pleasure of the conqueror. But all the wars in which we were engaged with the Cherokees, terminated in treaties of peace, in which each party stipulated with the other as an independent power. I am not aware of any fact in the history of that tribe, from which we can infer, that they ever were conquered. Neither the submission in 1730, nor the language used in the treaty of Hopewell, establish any such fact. No argument' can, therefore, be drawn in favor of our jurisdiction, from the principles of national law, arising from a supposed conquest. “The colonial authoritiés uniformly negotiated with them, and made and observed treaties with 'them, as sovereign communities, exercising the right of free deliberation and action.” Although a tribe may have been included within the boundaries of a charter, and the ultimate fee to the soil, may have been in the colony, and the tribe, in a national capacity, may have been considered as owing a qualified subjection to the British crown; yet, in an individual capacity, the Indians were - never regarded as owing subjection to the government of the colony, but within the boundaries assigned them, they were recognized as having a right to exercise a sovereign authority. Many of the tribes placed themselves under the British protection, and were considered as dependent allies. Of this character, was the submission of the Cherokees to Sir Alexander Cumming, and the like submission of the six deputies of that tribe, to the king of England, in 1730. (Report Com. Ho. Rep. Feb. 24, 1830.) This is proved to have been the understanding of the parties, by the manner in which they afterwards treated each other, and the relations which *346 were mutua% recognized as existing between then?» They did not surrender the right to govern themselves'? and, therefore, their partial submission did not destroy their character as a sovereign community. “One community may be bound to another by a very unequal alliance, and still be a sovereign state. Though a weak State, in order to provide for its safety, should place itself under the protection of a more powerful one, yet according to Vattel, b. 1, ch. 1, sec. 5 & 6, if it reserves to itself the right of governing its own body,. it ought to be considered as an independent State. There are several kinds of submission, says this same jurist, (b. 1, ch. 16, sec. 196,) “the submission may leave the inferior nation a part of its sovereignty, restraining it only in certain respects, or it may totally abolish it, or the lesser may be incorporated with the greater power so as to form one single State, in which all the citizens will have equal privileges.” Goodell vs. Jackson, 20 Jh. Rep. 711.
It is apparent, from the whole history of the Cherokees, that their submission was of the former kind, and that as an inferior nation, they were restrained of their sovereignty, in certain respects only. In the treaty of Hopewell, the Cherokees are treated as a nation, and throughout that instrument, their distinctive character, as a separate political community, is kept up and clearly acknowledged. The treaty of Holstein, made in 1791, recognizes them as a nation, calls their people citizens, abandons citizens of the United States settling on Cherokee lands, to be punished or not at the option of the Cherokees, provides that reprisals for injuries, (an attribute of sovereignty,) shall not be made by either party, until satisfaction shall have been demanded of the party of which the agressor is, and guarantees the Cherokees all their lands, not thereby ceded. All the subsequent treaties recognize and acknowledge the operative force of these treaties. “The United States,” says Chancellor' *347 Kent, (Goodell vs. Jackson, 20 Jh. Rep. 714,) never dealt with these people, within oür national limits, as if they were extinguished sovereignties. They have constantly treated with them as dependent nations, governed by their own usages, and possessing governments competent to make and maintain treaties. They have considered them as public enemies in war, and allied friends in peace.”
In the view I have taken of this question, I concur with the sentiment expressed by our commissioners at Ghent, where they say, “The treaty of Greenville neither took from the Indians the right which they had not, of selling lands within the jurisdiction of the United States, to foreign governments, or subjects; or ceded to them the right of exercising exclusive jurisdiction within the boundary line assigned. It was merely declaratory of the public law in relation to the parties, founded on principles previously and universally recognized.”
In like manner, I consider the treaties of Hopewell and Holstein, in their principal provisions, as only declaratory of the public law in relation to the parties, founded on principles, growing out of their peculiar character. The attributes of sovereignty, and the right to the soil there recognized, did in fact exist before, and were not conferred by those treaties. The provision, by the 12th article of the treaty of 1791, that reprisals for injuries shall not be made, until satisfaction shall have been demanded of the party of which the aggressor is, while it recognizes the jurisdiction of the Cherokees as a nation, and their right to avenge injuries done to any of their people, does not confer that right. It existed before the treaty, and this stipulation is only an acknowledgment_ of it. The guaranty to the Cherokees, in the 7th article of that treaty, of all their lands not thereby ceded, did not confer upon them any new right, in relation to their lands. They had a possessory right before the treaty, and having circumscribed themselves, by voluntary stipulations, within *348 reasonable bounds, they could not lawfully have been deprived of the possession of those lands, without their consent, independently of the provisions of this treaty. The guaranty is only a recognition of their right, and an undertaking to defend them in the enjoyment of it.
It is upon this same princple, that the American commissioners at Ghent, assert that the treaty of Greenville, did not take away from the Indians the right of selling lands, within the jurisdiction of the United States, to foreign governments or subjects. This right they had not before the treaty. Discovery, as heretofore stated, gave to the discoverers the exclusive right to extinguish the aboriginal right of occupation. The United States, after the revolution, succeeded to all the rights of the British government upon this subject, and consequently had the exclusive right to extinguish the Indian title. It follows, that the Indians could not sell to another nation, nor could such nation lawfully buy land of them. Therefore, the treaty of Greenville was only declaratory of this well settled principle.
From the preceding discussion, it will be seen, that in my opinion, although the European discoverers of this continent had a right to share with- the wandering tribes they found here, in a part of the immense territory of which those tribes were in no peculiar want, yet they did not have the right to take the whole from them, nor could they have rightfully reduced the inhabitants to submission to their jurisdiction, except such of them as chose to remain within the limits of the civilized nation, after leaving the barbarous tribe sufficient territory for their subsistence. This being the condition in which the principles of public lav/, as applicable to these people placed them, the practice of the country, from its discovery through all the successive changes of govornmeni, has continued to treat them as standing in the same condition, and has respected their rights as distinct political communities, except so far as their peculiar character, and i.ho *349 changes of their condition have made it necessary to abridge them. 1 have not examined the relative authority and jurisdiction of the State and Federal governments upon this subject, because no one pretends that the States have any more power in relation to it, than the colonial governments possessed; and if I have shown, as I think I have, that as against those governments the Indian tribes retained a possessory right to the soil within their limits, and the right of self-government, it follows that they have not lost those rights by the changes in our form of government, and that they still retain them, except where the assumption of jurisdiction has become necessary. This necessity, I say, has grown out of their peculiar character and condition. The acknowledged exclusive right in the discoverer, “to extinguish the aboriginal right of occupation,” made it indispensably necessary, for the preservation and enforcement of this right, to assume to some extent a jurisdiction over them. They were, therefore, restrained from trading with, or selling lands to other civilized nations, or their subjects. If this restraint had not been imposed, other nations would have purchased from them, and thus have acquired territory and jurisdiction within the very heart of the United States. The preservation of our exclusive right to acquire their lands, as well as the protection of our people ‘from the hostilities of. such nations as would have purchased from them, and who. would have excited the savages in the bosom of our country, to massacre our women and children, alike demanded, that we should abridge some of their natural rights of sovereignty, and hold them in a qualified subjection, in a national capacity, to our government. This was 'done by the British government, and through all the successive changes, up to this time, the government of this country has continued so to regard them. As a compensation, however, for this abridgement of their natural rights, the protection and guardianship of our government has been extended to them. But although, from the *350 necessity of the case, the qualified subiection, m a na- . . J . , . , 1 , , J ' ¶1 , tional capacity, has existed, yet they have rightiuiiy been. subject personally, only to their own customs and laws, except where a like necessity may have impelled the assumption of a partial, or as the case may be, an entire jurisdiction over them.
One peculiar fact, in relation to their history is, that their numbers and consequence uniformly diminish upon the approach of a civilized population. It is manifest •that principle which might very properly be applied to a warlike and powerful tribe of rude and uncultivated savages, situated at a distance from the residence of a civilized population, would be very inapplicable to a remnant of' that same tribe, when it shall have been overwhelmed by a surrounding civilized population, whose influence enters largely into its domestic concerns. When thus surrounded, and become so impotent as to be incapable of self-government, the government of the country, by whose population they may be thus surrounded, upon a principle of necessity, may subject them to its jurisdiction, so far as the necessity of the case may require it. Vat. Necessity, “that irresistible law,” as Vattel (b. 1, sec. 202) calls it, imposes it as a duty, and creates the right to interpose such authority. How else can a State fulfil its duties to itself and its.citizens? Upon this principle, the criminal jurisdiction of the courts of New York was extended over the Oneidas, numbering at that time upwards of six thousand souls. This, both the supreme court and the court of errors held to he justifiable; Chancellor Kent, who delivered the opinion of the court of errors, justifying it upon the ground that it was necessary, in order to put a stop to the practice of retaliation, and the atrocities to which it led. Nor is such partial jurisdiction, according to the same able judge, (20 Johns. Rep. 17,) inconsistent with the distinct national character of such tribe.
It is holden by Judge M’Lean, in the case of the *351 United States vs. Jonathan Cisna, (Nat. Int. 22d Aug. 1835,) that the State of Ohio had a right to extend its jurisdiction over the Wyandot reserve in that State. The Wyandot tribe once owned an extensive tract of fertile country; hut treaties of cession have been made until their territory is restricted to twelve miles square. Thus reduced and surrounded by the white population, the preservation of order and the punishment of-offences committed within the reserve, made it indispensable that the law should authorize the State courts to take jurisdiction of offences. “The exercise of this power,” says the judge, “by a State, would not be incompatible with the exercise of the power vested in the federal government.” That power extends only to the regulating their trade.
Having established, as I think, that the Cherokees once possessed a distinct national existence, having a right to exercise sovoreign jurisdiction over the territory within the bounds assigned them, except so far as their dependent condition induced a partial surrender of their sovereignty to the United States; and having shown that a nation or tribe, possessing these rights, may, by the change of circumstances, become reduced to such a condition as to authorize-a State, within whose limits it is situated, to assume additional jurisdiction; it becomes a question of great delicacy and difficulty, whether the legislature of this State had the right to extend the jurisdiction of our courts over that part of the Cherokee country within our limits, as was done by'the act of 1833. That act subjects all persons, both natives and others, to the punishment which our laws inflict for murder, rape arid larceny, as well when committed within the Indian territory, as if perpetrated elsewhere.
The condition of the Cherokees has undergone a very great change within the last ten years: The territory claimed by them is situated in the Stat'es of North Carolina, Georgia, Alabama and Tennessee._ A comparatively small proportion of it, containing but a few hundred *352 inhabitant d^es *n Tennessee. The Cherokees have made considerable advances in the arts of civilization. The hunter life has been almost entirely abandoned. Many of them are intelligent, living in good houses and have improved farms.
Ten years ago they were governed by a code of wholesome written laws, administered by regular, judicial tribunals, and order was well preserved, and justice correctly administered.
But this state of things has undergone a very great change. Georgia, within whose chartered limits the principal part of the Cherokee territory is situated, several years ago extended its laws, civil and criminal, over the Indian country, and disposed of their lands to the citizens of the State. All government and authority among the Indians was, by this proceeding, broken within that State. The rigorous execution of the Georgia laws, produced a general state of confusion among the Indians. Their appeal to the government of the United States was answered by a declaration, that that government had no authority to interpose its power to prevent the execution of the Georgia laws. Soon after this, the legislature of Alabama, in like manner extended its laws over that part of the Indian territory within that State. In this state of things a natural consequence occurred. The authority of the Indians have been broken down, the white population crowded into the Indian territory. Taking into view the confusion and exasperation of the Indians, and the fierce and unprincipled character of many of those who lived near them, and had settled among them, it was almost certain that crimes of every description would be of frequent occurrence. How were they to be punished? The state of disorder among the Indians, and the imbecility of their authority, alike precluded any just expectation, that they could or would preserve order and suppress crime, in the language of Chancellor Kent, “was such a state of things to be tolerated, in the neighborhood and under *353 tile eve of a civilized and Christian people? Under teh circumstances in which we are placed, m relation to those Indians, as their guardians and protectors, have we not a right to avail ourselves of the superiority of our situation and interpose our authority’* and jurisdiction for the preservation of order, and for the protection of the Indians themselves, as well as of our own horder-citizens? I cannot say we have not. Certain it is, that whenever such a people become surrounded by a stronger nation, and they become too imbecile to govern and preserve order, it is the right and duty of the stronger, to interpose its authority. Whether this State of things existed at the time of the passage of the act under consideration, or at this time, in that part of the Cherokee country within our borders, I have had no means of judging, except from the newspaper publications of the day. - From these, I understand the state of things to he such as I have described it; and if this be true, then it was a question for the wisdom of the legislature to determine. Indeed, it may admit of doubt, whether this is properly a judicial question. The change of some of the Indian tribes from that State, in which they were clearly entitled to the character of a sovereign community, to that in which they were as clearly liable to be subjected to the jurisdiction of the State, has been so gradual, that probably the precise time, when this authority might-rightfully have been extended over them, could not be designated, so that different persons, possessing the same general views of the subject, would be agreed upon it. After all, it probably must depend upon the sound discretion of the legislature. At least,_ the difficulty of determining with precision upon the subject, should induce the courts to sustain the act of the legislature, unless that ’ act is plainly unauthorized. When the legislature pass a law,' the presumption is in favor of its constitutionality; and before the courts can be called upon to declare it void, it must clearly appear to *354 have been passed without authority. This cannot be said Of the act of 1833.
It has been said, that the right of this State to extend its jurisdiction over the Cherokees within our limits, being dependent upon the state of things produced by the Georgia legislation, that in extending that jurisdiction, we take advantage of our own wrong. Admitting that the Georgia legislation was unauthorized, and that the consequences of that legislation produced the necessity for the act of 1833; still we are guilty of no wrong, for we had no control over Georgia, and could not have prevented what she' did. In truth, we are only, to look at the actual state of things, and if .we find them such as to demand the interposition of our jurisdiction, however produced, we ought not to be deterred by abstract theories, but like practical men, act upon the necessities of the case as they exist.
Upon the whole',"! am of opinion,
1. That our ancestors, by discovery,, had aright to take, occupy and exclusively enjoy, a part of the extensive territories of which the Indians were in no particular want. • .
’ y 2. That they had not the right to deprive the Indians of all the lands they inhabited, nor to subdue them to their authority and jurisdiction, otherwise than as hereinafter stated.
3. That they acquired, by discovery, an exclusive right to ‘ extinguish the aboriginal right of occupancy to the "whole extent of the country discovered.
4. That this exclusive right to extinguish the Indian right of occupancy, together with the right,, (growing out of the former), to the fee simple of the soil, authorized from the necessity of the case, the exertion of a partial control of And jurisdiction over' the Indian tribes, in a national' capacity, so as to prevent them from trading with, or selling land's to other civilized nations, or their subjects.
5. That after a treaty had been made with an Indian *355 tribe, and a boundary prescribed for them, the lands within that boundary could not rightfully be acquired but by a voluntary cession from them, or as tHe_ result of a conquest over them, produced by a jüst and necessary war provoked by them.
6. That jurisdiction over them personally, cannot be rightfully assumed, unless their peculiar condition shall ' render it necessary for the preservation of order and the suppression of crime, and then, to such extent only as the necessity of the case may require.
7. That such necessity exists at this time, for the operation of the act of 1833.
I am, therefore, of opinion the judgment ought to be reversed, and the prisoner remanded to be tried upon the merits of the case.