It is admitted that the lands in question lie within the limits of North Carolina, and also within the boundaries of those lands which were set apart for the nation of Cherokee Indians by that State before the cession of Tennessee to the United States. It is also *Page 84 
(169) admitted that the Cherokee nation lived upon those lands, and other adjoining lands, both while this State was a colony and after that time.
In the examination of this case it would be useless to inquire with what justice it was that the King of England seized upon these lands and declared himself sovereign thereof, without regarding the rights of the inhabitants whom he found in possession of them; because those rights formed no item in the title now relied upon, either for the plaintiff or defendant. This subject will be found to be ably and satisfactorily discussed and elucidated by the Chief Justice of the United States inJohnson v. McIntosh, 8 Wheat., 543.
While this State was a colony the British monarch not only claimed and exercised acts of sovereignty over it, but he, or those to whom he granted it, claimed a right to the soil itself.
By the Declaration of Independence, which gave to North Carolina as well as the other States their freedom and independence, all right to sovereignty and soil was transferred from the British Crown to the State of North Carolina, and the first step consequent thereon was the adoption by her of her present Constitution.
In section 26 of the Bill of Rights it is declared "that this declaration of rights shall not prejudge any nation of Indians from enjoying such hunting ground as may have been or hereafter shall be secured to them by any former or future Legislature of this State." After that time, in 1778, N. Rev., 137, the Legislature passed a law prohibiting all persons from hunting on their grounds; and also in 1783 they passed another law by which they reserved to them and their nation forever their lands by metes and bounds, for bidding purchase to be made from them and denouncing penalties against all persons who should make entries on their lands. The Constitution and these laws were (170) guarantees of the nation's rights by the State of North Carolina.
By the Articles of Confederation, of which the State of North Carolina became a member, it is declared in Article 9, "that the United States in Congress assembled shall have the sole and exclusive right and power of regulating the trade and managing all affairs with the Indians, not members of any of the States; provided that the legislative right of any State, within its own limits, be not infringed or violated."
In 1785 commissioners were appointed by Congress, who made the treaty of Hopewell. By this treaty the Cherokees are declared to be under the protection of the United States, and the boundaries of their grounds are agreed upon.
By section 8 of Article I Constitution of the United States, Congress are empowered to regulate commerce with foreign nations and among the several States, and with the Indian tribes. In the year 1791 another *Page 85 
treaty was made with them, under the authority of the United States, by William Blount. By this treaty they are also declared to be under the protection of the United States, and new boundaries are marked out and agreed upon for their lands. Citizens of the United States are forbidden to hunt upon their lands, and all their lands not then ceded were solemnly guaranteed to them.
The next treaty was made in 1817 by Andrew Jackson, Joseph McMinn, and D. Meriwether, commissioners on behalf of the United States. By this treaty 640 acres of land was given to every head of an Indian family who wished to become a citizen of the United States, out of the ceded lands, to be laid off in a square, including their improvements, which improvements were to be as near the center as possible, in which they were to have a life estate, with a reversion to their children.
Another treaty was made by the Secretary of War on behalf of the United States in 1819. In this treaty the same reservation of lands is agreed upon to each head of an Indian family residing within the ceded territory who choose to become citizens of the United States (171) in the manner stipulated in the former treaty of 1817. In the same year, but afterwards, the Legislature passed another law prescribing the mode of surveying and selling the lands lately acquired by treaty from the Cherokee Indians. No clause in this act relates to the land reserved for Indians who might become citizens of the United States under the two last treaties. By this law the Legislature seems to sanction and adopt the provisions and stipulations of the treaties of 1817 and 1819; they accept of the land ceded by those treaties; they speak of them as acquired by the treaties, and proceed to direct the mode in which they shall be disposed of; and there is no dissatisfaction expressed, nor is there is any reason to believe that any was felt at the stipulation in the treaty by which a portion of the lands were reserved for certain Indians; and when it is remembered that the United States gave to the Indians, out of lands belonging to the United States, an equivalent for the lands ceded by them, perhaps it will not appear that there was much room for dissatisfaction.
By an act passed in 1820 any person is forbidden to buy or cultivate any of the lands reserved to the Cherokee Indians by the treaties of 1817 and 1819. This expression of the public will is strongly corroborative of the plaintiff's right under those treaties.
The Legislature by another act, passed in 1821, gave authority to any white man who shall have purchased from this State at the sales made by commissioners under the act of the General Assembly lands reserved for the Cherokee Indians, to purchase or extinguish the right of the Indians to whom said lands were reserved. By this act the right of the Indians under the treaties is unquestionably acknowledged. *Page 86 
In 1822 another act was passed which provides for the sale of (172) lands lately acquired by treaty from the Cherokee Indians, which have been surveyed and remain unsold.
In the following year the Legislature passed another law respecting the reservations of certain Indians in the lands lately acquired by treaty from the Cherokee nation. By this act commissioners were appointed to contract with them for lands which the commissioners may believe they have a right to under the treaty; and by the 5th and last section in that act it is declared that when the commissioners appointed by this act shall adjudge that a title claimed by an Indian to a reservation under the above mentioned treaty is not a good and valid title where the land so claimed has been sold under the authority of the State, and the purchaser has been sued for the same, it shall be the duty of the Governor to employ able counsel to appear on behalf of such purchaser. This act, as well as those preceding it, recognizes the title of the Indians to the lands reserved for them under the treaties. But the Legislature, by the last clause, guarded against pretended Indian claims that might be attempted to be made under the treaty, not sanctioned by it. But if the claim now set up by the plaintiff is one of that sort, it has not been made to appear so to this Court.
It appears that the lessor of the plaintiff has elected to become a citizen of the United States by enrolling himself under Colonel Meigs, Indian agent, according to the provisions of the treaty.
It appears that a commission issued from James Monroe, President of the United States, to Robert Houston to survey the lands reserved for the Indians within the State of Tennessee, but not those reserved for the Indians in North Carolina. Of course, that commission can have no bearing on the case. A letter from the Secretary of War to Robert Houston was given in evidence, authorizing him to survey the lands reserved for the Indians in North Carolina. I am not prepared to say that that is a legal authority for making the survey. (173) However, it appears that the defendant is in possession of the lands contained in plaintiff's declaration. Of course, he is in possession of the plaintiff's improvements and the land adjoining thereto, to which the plaintiff has a right under the treaty.
I do not pretend to say that the plaintiff has any right to recover in this case upon any title which he or his nation had before the treaties of 1817 and 1819. Before that time their right was a national right; no individual had any distinct right to any particular part, but they all had a right to the whole. The national right was the subject of contract when the treaties were made. It was the consideration for which the United States lands were given on the west side of the Mississippi, and the general relinquishment of it was the consideration for which *Page 87 
certain reservations were made by the same treaty (one of which the lessor of the plaintiff has acquired title to and holds it, not as one of the Cherokee tribe, but as a citizen of the United States under the treaty).
It has been objected that their title has not been evidenced by a grant. This objection would be good if the land in dispute was claimed under those laws which point out the manner of acquiring title to vacant lands in this State. But that mode is not pointed out by the treaties under which the plaintiff claims; his title is the treaty, which treaty is recognized by North Carolina. It is not an uncommon thing in this State to claim title directly under an act of Assembly. The trustees of the University claim title to the escheated lands in this State under an act of the Legislature; no grant was ever made to them.
It has been said in argument that the commissioners had no authority to give away the Indian lands; that the present case is one of a gift to the plaintiff. When it is remembered that the possession and use of the lands were guaranteed to the Cherokee nation both by this State and the Congress of the United States, and that the Indians gave up the possession of those lands, with the exception of the reserved lands, for lands beyond the Mississippi; and that if those reservations had (174) not been made a greater quantity of lands would have been insisted on by the Indians, in addition to those which have been given them west of the Mississippi — I say, when these things are kept in view, we must consider the plaintiff as a purchaser of the land; and that he claims it under a legitimate exercise of power by the commissioners, acting under the authority of the United States, and that the stipulations in the treaties of 1817 and 1819 have been acknowledged and recognized by the State of North Carolina in the several acts of Assembly which she has passed from 1819 up to the present time. From all these considerations I think the rule for a new trial should be discharged.
HENDERSON, J., assented.
PER CURIAM. No error.
Cited: Frazier v. Cherokee Indians, 146 N.C. 481. *Page 88