Catron, Judge.
The only question to be decided is, which is the better legal and possessory title, that of Stuart under his grant from the State of North Carolina of 1800, or of Brown under the treaty of February, 1819? I will state the result my mind has come to, from the arguments of the counsel, and the authorities examined upon the subject.
1st. The grant to Stuart as between the grantor and grantee, the State of North Carolina and himself, is valid, but it was made to Stuart incumbered with the Indian title to the land granted.
2ndly. And what is this Indian title? It has been cal-, led by the courts of this State, a usufructuary right, nor will I call it by a different name, but will proceed to state a few of the facts and reasons, from which the conclusion has been drawn that the reservation to Brown was lawfully made.
When the European Colonists found the Cherokee Nation of Indians, they were residing near to, and about the land in controversy, and so continued to reside, and enjoy the possession of this spot up to the treaty of 1819, and to exercise over it as much sovereignty as they did over any other part oí the territory of the nation. The Cherokees have at all times, since we knew any thing of their history, had a government of their own; and in latter times many of their people have been the owners of considerable personal property, and cultivators of the soil, to a very considerable extent; and in 1819 were, and now are, far removed from the mere wandering and wild savage who depends upon hunting and game, for the means of subsistence, and makes war a livelihood. Those of them, who resided within the limits of this State, and on the territory ceded to us in 1819, might rather be deemed a grazing and agricultural, than a hunting people, and there *145 fore, had much use for their soil; and that they had the • i , , , . right to use and occupy it within their own territorial hm-its, unmolested by our citizens, has not been controverted for many years. The supreme court of the United States in the case of Johnson vs. M’Intosh, (8 Wheat. 603,) says, when speaking of the American Indians generally: “It has never been contended that the Indian title amounted to nothing. Their right of possession has never been questioned. The claim of government extends to the complete ultimate title, charged with the right of possession, and to the exclusive power of acquiring that right.” It is said in the same distinguished opinion, that, “the British Government which was then our Government, and whose rights have passed to the United States, asserted a title to the lands occupied by the Indians, within the chartered limits of the British Colonies. It asserted a limited sovereignty over them, and the exclusive right of extinguishing the title, which occupancy gave to them.— These claims have been maintained and established as far west as the Mississippi by the sword. The title to a vast portion of the lands we hold, originates in them. It is not for the courts of this country to question the validity of this title, or to sustain one which is incompatible With it.”
The Cherokees had at least claims to the soil, as well founded as is above set forth by the supreme court of the United States, previous to the treaty of Holstein made in 1791, and which possessed rights, were recognized by North Carolina, as will be seen by their constitution of 1776, decl. of rights sec. 25, act of 1778, ch. 3, sec. 5,1783 ch. 2, sec. 3, 6, 7.
In 1789 the soil and sovereignty of what is now the State of Tennessee was transferred by N orth Carolina to the United States, and in the same year the treaty-making power, and the right to regulate intercourse with the Indians was vested in the Federal Government.
In 1791, was made by Gov. Wm. Blount on behalf of the United States with the Cherokee Nation of Indians, the treaty of Holstein; by the 4th article of which, cer *146 tain boundaries are fixed between the Indians and the peo-pie of the United States, which were to be plainly marked by three persons on each side; and the Indian Nation did by their chiefs and warriors for an annuity of one thousand dollars, for and on behalf of the Nation, its heirs and descendants, release, quit claim, relinquish and cede a portion of their lands to the United States; and in return, the 7th article of the treaty stipulates that “ the United States solemnly guaranty to the Cherokee Nation, all their lands not hereby ceded.”
After this treaty there was a war with the Indians, and in June 1794, the treaty of Holstein as to boundaries, and in all other matters was fully ratified and confirmed.
By the treaty of Tellico made in 1798, articles 2 and 3, the treaties of Hopewell and Holstein are again recognized in the strongest terms.
By the 9th article of the treaty of Hopewell made in 1785, the Cherokees stipulated with Congress, that the latter should have the sole and exclusive power of regulating the trade with the Indians, and managing all their affairs in such way as they might think proper. “That the Indians may have full confidence in the justice of the United States respecting their interests,” says the 12th art. of the treaty of Hopewell, “they shall have the right to send a deputy of their choice whenever they think fit to Congress.”
By the 2d article of the treaty of Holstein, the Cherokees stipulated with the United States to be under their protection,, and that of no other sovereign whatsoever, and that they will hold no treaty with any foreign power, individual state, or with individuals of any State.
It cannot be said that this nation of Indians, “remains in a state of nature, and have never been admitted into the general society of Nations.” They are in truth a nation of people under the tutelage of the Government of the United States, by whom they are protected and partly governed through agents, by force of our treaties with them.
It would be mocking the Indians to say the 7lh article *147 of the treaty of Holstein means nothing; all the lands not ceded to the United States by .that treaty, are guaranteed to the Cherokee nation by the United States, in as apt and strong words as our language is capable of. What is the import of this guaranty? That the United States will protect the Cherokee nation in the enjoyment of their lands, not ceded, against all governments, and that no State Government, or the citizens of any State Government, shall deprive the Cherokees of such occupancy and enjoyment. The phrase of guaranty is one perfectly familiar in European treaties, and its meaning well defined by writers on national law. See Vattel B. 2, ch. 16, sec. 235. The treaties of 1785 of Hopewell, of 1791 of Holstein, of 1794 and 1798, with the Cherokees, taken together, do not only guaranty the rights of the Cherokee nation to the soil undisposed of, but they really have, to a very considerable extent, incorporated the Indians with the Federal Government: nor is this true in theory only. The rights of the Indians are in practice protected with as much fidelity through our Indian agent, and Governor in fact of the nation, as are the rights of American citizens; and are as much protected by our laws whereby treaty we have solemnly pledged ourselves to do so.
And hence this guaranty is of a much more forcible character, than similar ones found in European treaties, where the rights and possessions of independent nations are guaranteed by a neighboring power.
That our recognition of certain rights in the Indians, to the soil they occupied, and our compact to support those rights by the treaty of Holstein, are binding upon us, has not been questioned for thirty years. Indeed, this State was then a territory of the United States, governed exclusively by the federal power, the governor of which territory, made the treaty as agent of the United States. If at any time since our guaranty of the treaty of Holstein was made, and after the boundary agreed upon was marked, our citizens trespassed upon the lands we had secured to the Indians by the treaty, they were removed either by military force, or the federal courts. *148 by powers vested in those courts by acts of Congress; which acts declare it highly penal in our citizens to violate the Indian possessions; and by force of which the grantee would assuredly have been turned off and punished, had he taken possession of the land granted to him, before the treaty of 1819 was made.
The rights belonging to the Cherokee nation, before the treaty of Holstein, and those secured to it by that treaty, did then give to the Indians an undisputed title to use and enjoy “their” lands, until the government of the United States, by purchase or otherwise, should acquire the right from them; nor was it in the power of a private individual to acquire it, although he might have had lands granted to him within the Indian boundary. David Stuart took the grant at a time when his right of possession to the land granted, was suspended and enjoyed by others, for the extinguishment of which right, he relied on his government. This possessory right in the Indian Nation, has long been considered in the nature of a property over the soil, and subject to any of the Indian natives, when the sovereignty of any part of the Indian country was ceded to the United States. From the very nature of the title, it must be deemed property. The grant to Stuart then, having been taken encumbered with the Indian title of possession to the land, which was a right of occupancy and independent of the grant, and this possessory title being the subject of assignment and transfer by treaty, to which the Cherokee Nation and the United States should be parties, and the same having been transferred to Brown by this mode, he retains (in “reserve”) the title of the Cherokees.
How is it that Stuart claims to take possession of the land in controversy? By virtue of the treaty of 1819. Before the treaty, all admit he had no right to enter upon the possession. Does the treaty secure to Mm this right? Surely not. The treaty is either valid or void, so far as the reserve to Brown extends. If valid, then the Indian title is in Brown; if void, then it is where' it indisputably was before the treaty — in the Cherokee Nation; and *149 hence by a legal consequence, the right to enter upon the land has not been secured to Stuart, or his assignee by the treaty. A violation of the article of the treaty on the part of the United States, which reserves to certain of the Indians part of their former possessions; and which reserve was a moving consideration to induce the Indians to part with their title, to the lands ceded, mould and ought to destroy the whole treaty, and leave the Indian title where it was in 1819, before the treaty — in the Cherokee Nation, and not the grantee, Stuart. (Grotius, B. 2, ch. 15, sec. 15. Vattel, B. 2, ch. 13, sec. 200, and 206. B. 2, ch. 17, sec. 304, 305.
It was through his government alone, that Stuart could get the possession of the land granted; because the United States alone had the power to deal for and extinguish the Indian title; and the grantee’s right of possession having stood suspended before the treaty, so it stqnds after the treaty; nor can it ever arise until the Indian title transferred to Brown, is vested in Stuart directly, or indirectly; which latter mode of vestiture would happen, if the right to take the possession was to be transferred to the United States, who could not dispute the validity of the grant from North Carolina to Stuart; which grant by the compact of 1789, between North Carolina and the United States, would he equally binding upon both the governments, as grantors, and consequently upon the State of Tennessee. But the Indian Nation was no party to this grant; its usufructuary title was not thereby affected. North Carolina had no right to take it from the Indians for Stuart’s benefit, without their consent; this consent they have not given, and therefore no right to prosecute this action to recover the possession of the land, has ever vested in Stuart; hence he must fail upon the weakness of his own title.
In this opinion, I have founded myself principally upon the authority of the opinion of the supreme court of the United States, in the case of Johnson vs. M’Intosh, reported in 8 Wheaton, the treaties with the Cherokee *150 Nation of Indians, and the construction of, and practice under these treaties.
I hold that the early notionsofthe Spaniards an 1 others, Hhat the Indians were mere savage leasts without rights of any kind,” have long since been exploded, as the rtsult of avarice, fraud, and rapacity; and that those who acted upon them, are at this day deemed by the people of the United Slates, more savage and cruel than those they despoiled. The Cherokees are, in point of fact, a conquered people, (see Vattel, B. 1, ch. 1, sec. 2,) with acknowledged rights; which rights, I am proud to say, have for the last thirty years, been respected with that good faith on our part, that became us as honest men and Christians, and which the courts of justice are bound to regard.
I think the circuit Judge erred in charging the jury: that the judgment should be reversed, and the cause remanded to the court below, for another trial.
Whyte and Peck, Judges, concurred.
Haywood, Judge.
The plaintiff below, having obtained a verdict and judgment against Comet in an action of ejectment, the latter has, by an appeal in the nature of a writ of error, moved the cause into this court. The facts appear to be these. In 1800, a grant issued from the State of North Carolina for a thousand acres upon an entry made in John Armstrong’s office in 1783. The land lies on the north side of Tennessee river, in the district set apart to be entered in that office by the act of 1783, ch. 2, and is included also in the territory which by the treaty of 1791, was acknowledged to belong to the Indians. This territory, including the lands in question, was ceded by the Indians to the United States by a treaty made in 1819, in which it is stipulated that a reservation in fee simple of 640 acres, including improvements, and which are to be as near the centre as possible, shall be made to each of the persons whose names are inscribed on the certified list annexed to the treaty. The reservations are made on the condition that the reservee shall notify in writing to the agent of the Cherokee nation within six *151 months after the ratification of the treaty, that it is his intention to reside permanently on the land reserved.— By the treaty of 1817, art. 8, it was agreed that to each head of a family residing on the east side of the Mississippi river, on the lands that are now, or hereafter maybe, surrendered to the United States, who may wish to become citizens, the United States do agree to give a reservation of 640 acres of land in a square, to include their improvements, which are to be as near the centre thereof as may be practicable, in which they shall have a life estate, with a reversion in fee simple to their children, reserving to the widow her dower &c.; provided, that if any of the heads of families, for whom reservations have been taken, should remove therefrom, then, and in that case, the right to revert to the United States. Brown is one of those whose names were inscribed in the list; and he made the notification in due time of his intention to become a permanent resident. He was in possession on the day when this action commenced.
The first question which I propose to consider is, whether Stuart, who conveyed to Winton, had a good title by virtue of his grant in 1800 and up to the time when the treaty of 1819 was made and ratified.
It is proper to remark in the out-set, that whatever claim of the Cherokées was put an end to by the treaty at Fort Stanwix, soon after the war which terminated in 1763, or by their treaty with Henderson in 1775, was restored to them by the treaty of 1777, when their territory was admitted to extend eastwardly as far as Cloud’s creek and Brown’s line. So matters rested, when in the year 1783, their bounds were reduced, and all the lands beyond them were exposed to sale by an act of the legislature of North Carolina. This being done without the assent of the Indians, and without compensation made to them, the lands are supposed by some to have been illegally sold, especially, as by the treaty of 1791, their bounds were enlarged so as to comprehend a great part of the lands thus exposed to sale. And it must be admitted, that if the dominion of these lands resided in the Indians that *152 the grants of North Carolina could not vest a right of property in her grantees. It is proper, therefore, to en-quire what title they had antecedently to these treaties; and I shall lay it down as a correct legal proposition, that legally speaking, the Indians had neither jus in re nor ad rem; nor any right or title which the law recognized. They were indeed in the country before we came to it; and if this should sound harshly in modern ears, it must be remembered that all rules which have come down to ns from ancient times appear in grotesque forms. It was but lately that the effects of collateral warranty were abolished; that the wager of law and the succession of the first born male to the father’s inheritance were abolished; yet, titles derived under these laws are still as valid as if they never had been superseded. They suited the times and people with whom they originated, and having become for a series of ages the acknowledged law of the country, to disturb the effects produced by them at this day, would bring on us the most ruinous confusion. It would be enough to state what the law was, when the first grants issued for those parts of America which are now covered by the United States. But to a jurist it would be more pleasing to go to the origin of those fundamental rules upon which our public and private titles are built. The mind delights to repose on a legal origin rather than upon usurpation and violence. — ■ The Indians have no just right to complain; the same law which they practised, when whole nations melted away in • their presence, with all the acts of civilization of which they have left us memorials, has only been used against them. To have a correct view of the rules adopted and applied to Indian affairs when grants were issued by the Kings of England for lands in North America, we must look to the prevailing opinions of those days in matters of religion. The spiritual father of Christendom dictated the creed of the people, and assumed enormous powers upon that passage of scripture which is found in Matthew ch. 16, verse 18. As the successor of St. Peter, his grants of infidel countries were considered binding in heaven, *153 and of course, upon the consciences of Christians. The unquestionable tenets which they all held, are those laid down by Lord Coke in Colvin’s case* that all infidels are in law perpetual enemies; for between them as with the devils whose subjects they be, and the Christian, there is perpetual hostility. The old law of nations, too, had not then been superseded by the modern, so far as regarded their conduct towards infidel countries. It had been practised upon by all the nations of antiquity; the Babylonians, Persians, Greeks and Romans, and by the Israel-ites under the guidance of Moses and Joshua. According to what it permitted, they extirpated the inhabitants of the countries they invaded, driving them from their habitations or killing or enslaving them as best suited their present circumstances. With these religious opinions and this law of nations for their government, the Spaniards came to the frontiers of Mexico with a grant in their hands given by the supreme disposer of earthly possessions, by which the whole continent of America was made subject to their dominion. They called upon the nations to renounce their errors and the religion of their ancestors, and to embrace the only true faith or to yield up themselves and their country to the government of the newcomers. Under this law of nations, they sent for slaves to Africa, and consigned the captives and their descendants to perpetual bondage. Under these auspices, was European dominion over the soil and over the bodies of men interwoven into the codes of American jurisprudence. It was deemed a title of the highest authenticity throughout the whole Christian world. When the reformation came forward, the papal pretensions were curbed; but the monarchs of Europe took to themselves some parts of the power, which could not be safely entrusted in the hands of pontifical ambition. Infidels with them, too, were no less subjects of the devil than they had been before; and might justly be deprived of all their possessions and of all the rights which they claimed as beings of the same race with themselves. Their countries were granted away by these new masters; and they themselves *154 were reduced at times to slavery, as the Cherolcees were in the wars of 1747 and 1761. Under these laws, the title to such of them as slaves, who were taken while the acts of Assembly for the purpose continued in force, and to their posterity after them, is valid to this day. In the act of 1741, ch. 24, sec. 3, concerning servants and slaves, it is provided in effect, that if one born free in an infidel country is imported hither as a slave, and be not a Moor or Turk in amity with our country, he shall not he allowed to claim his freedom in our courts; of such little consideration were the unchristian inhabitants of the earth in those days!
The titles under these systems continue to this time. They had a legal origin, which at the period of its commencement, would have been sustained by the most learned jurists. Upon these foundations do the territorial claims of our people stand supported at this moment. The sovereigns of Europe, to prevent collisions among themselves, established a rule that one nation should not interfere with the countries first discovered by another, and taken possession of by it. And hence the instructions given to all captains who sail on voyages of discovery, to land and put up permanent marks of their having landed and taken possession for their sovereign. When, then, the countries which we now occupy were discovered and settled by the French, the English, and Dutch, in the sixteenth century, and were granted by their sovereigns respectively, their grants were of perfect validity according to the law acknowledged among nations. The territorial dominion passed by the grant, and the infidel Indians residing upon it were tenants at sufferance. They had no right of property or possession, and were removable at the pleasure of those who were lords of the soil. If treaties were sometimes made, and cessions of land obtained, it was in compliance with their savage notions, which it was more politic to soften than to correct. The compensations were small and inadequate, and for the gratification of the Indians were called the price for the purchase; when it was evident to all that these were not the moving *155 causes of the relinquishments which they made. They had no right oí property in the soil: nor had they, as seems to be admitted in 8 Wheaton, 567, any right of possession therein, if they had a right oí possession, by what rule is it, that they had not the right of property? Grant one, and all must be granted. Take away one, and all must be taken away. What is called the extinction of Indian claims, is the invention of policy, to obtain without force what it is proper for the people to have; is a gratuity to quiet resentment, and not to purchase a right. This price for quiescence is frequently not given, when the scourge of war has humbled their spirit, and their dissatisfaction is not dreaded.
In 1783, the Assembly of North Carolina, without any precautionary measure, set up the lands for sale which the Cherokees claimed. Supposing a right of property to reside in the Indians, no property passed by the grant of North Carolina. But upon the foregoing principles, the state of North Carolina had the property, and it legally and validly passed to the grantee under the act of 1783. Also, if North Carolina had not the right of possession, no such right of possession passed to the grantee; but it certainly did pass, for otherwise there was not any' necessity for its suspension by the treaties of 1785 and 1791. Why give up this right of possession for the present, and why did the Cherokee nation negotiate for it, if they had it already? The grantee could not afterwards take possession, because by the treaty he was forbidden to do so. The grant, then, under the act of 1783, transferred to the grantee a right of property and of possession; but after these treaties he had a right of property, and only a suspended right of possession. The treaty of 1785, which was made in the time of the Confederation, gave up the present right to take possession, and North Carolina submitted; though it is now urged that a treaty cannot.give up the right of property.
If other examples in our juridical history were needed, - they are at hand. In the time of the Frankland government, a great number of adventurers settled upon the eas *156 tern end of the Indian hunting grounds, as circumscribed by the act of 1783. The consent of the Indians was not given; nor was compensation made to them for the intrusion, when the cession act of 1789 passed. Proceeding upon the ground, that without any relinquishment by the Indians, the State having both the right of property and the right of possession in the soil, could open an office for the appropriation of the lands upon which the settlers had seated themselves, they made a provision in their behalf. In the 10th article of the cession act, it is provided, “that this act shall not prevent the people, now residing south of French Broad, between the rivers Tennessee and Big Pigeon, from entering their pre-emptions in that tract, should an office be opened for that purpose, under an act of the present General Assembly.” Pre-emption is a privilege of purchasing in preference to others, for having first taken possession of that section of country in which the privilege is allowed. Congress, in 1790, ratified this article amongst others, and accepted of the territory offered to them upon this condition. Here was recognised a right which could not be placed upon any legal foundation, if the property or right of possession, did legally pertain to the Indians. North Carolina considered, as she had done before in all her provincial and State acts, that the pretended title of the Indians, was mere moonshine. It never was any thing more. The constitution of this State, made and ratified in 1796, and which was also approved of by the U. States before the admission of this state into the Union, contained this clause; schedule 1, sec. 8: “Until a land office shall be opened, so as to enable the citizens south of French Broad and Holslon, and between the rivers Tennessee and Big Pigeon, to obtain titles upon their claims of occupancy and pre-emption, those who hold lands by virtue of such claims, shall be eligible to serve in all capacities, where a freehold is by this constitution, made a requisite qualification.” Thus, in direct opposition to the Indian title, there grew upon the foundation of the State’s right of property and possession, a tenure which attracted to itself all the privile *157 ges, that freeholders, claiming under the most regular grants, ever had. What would become of their titles, as well as all those given under the act of 1783, were it now to he taken, that the Indians had a right of posses•sion or property in the lands, when all these titles originated ?
According to these principles, the grant to Stuart, under the act of 1783, was valid, and conveyed to him a legal estate therein, in fee simple. But is it also valid, notwithstanding the treaties of 1777, confirmed by the legislative act of North Carolina of 1778, and notwithstanding the treaties of 1785 and of 1791?
The treaty of 1777, made the mouth of Clouds’ creek and Brown’s line, the boundary of the Indians to the east; it was removed more to the west by the treaties of 1785 and of 1791. If, as argued, the agreement on the part of North Carolina, in 1777, that the Cherokees should have forever, the lands included within their bounds, gave to them a right of property or of possession in these lands, the legislature in 1783, could not, without their consent, take away that territory from them, or parcel it out to her own . citizens. But these stipulations in the treaty, only restored them to the same situation, with respect to the lands unceded, as they were before the war; and notwithstanding any past, or then existing cause of offence, they might remain forever upon the territory they then occupied, as before they had done, at the will and pleasure of North Carolina. If this be not so, every entry made in 1783 was a void entry, and all the grants that were founded upon them, were void likewise. If, by this treaty, they had a right of occupancy, independently of the will of North Carolina, more durable and permanent than that which they had before, such right could not have been taken away by the treaty of 1783, and could not have passed by the grant to Stuart. So by the treaty of 1785, no right of property passed, nor by that of 1791. Good faith required from North Carolina and the United States, forbearance as to the taking of actual possession; the honor of the nation requir *158 ed that it should not be violated. Such forbearance was not the effect of either a right of property or of possession in the Indians. If they had a right of property or possession, they were prohibited by the King’s proclamation of 1763, by the legislative acts of the province of North Carolina, and by an express declaration in the constitution of North Carolina, to sell them but to those who were authorized by the State to purchase them for public uses. If they had a right of property, it was a right which they were not allowed to transfer; if they had a right of possession, it was incapable of being assigned to others. If, with the consent of the United States, they could transfer it to individuals, the right to transfer would be prior to the interest, whatever it was, that passed by the grant of North Carolina, under the law of 1783, and the grantee of a reservation, in fee simple, would exclude the grantee under North Carolina, forever. But then the grantee of the reservation, deriving his title under the Indians, would have the same and no greater interest than they had; one not alienable and dependent for its duration, upon their occupation of the country. If, for want of property in North Carolina, it did not pass by its grant, but only a right in expectancy to take effect upon the cessation of the Indian title, then, in case of several grants, the right of property would vest in all at the same instant, when the Indian title was extinct, and he that could first get possession would be preferred. Experience shows that-the law is not so; but that the property vests in the first grantee, at and from the time of the entry, and of course, must have passed from the State at that time; and that she had it to pass. If the Indians had the right of property or of possession, they passed it to Henderson & Co. in 1775, and all the North Carolina grants under 1783, are void. If they even had the right of possession forever, and could transfer it, they passed it to Henderson. Their deeds gave to him all that they had or could pass. But having no right, either of possession or property, their deeds passed nothing; and North Carolina gave to Henderson, for the *159 purchase he made of them, 200,000 acres, as a compensation for his services and expenses. It has always been considered that the Indians have no property in the soil.
It is declared in the constitution of North Carolina to be in the people of that State; no treaty which could be made in 1777 could make it otherwise. In 1783 it remained in the people of North Carolina, and they granted a part of it to D. Stuart. In 8 Wheaton 456, 567, it is expressly laid down by the supreme court, that the Indians had no property in the soil; and though it is admitted there, that they had a right of possession, yet it is one which they could not transfer but to the State for the public benefit. Whatsoever right, then, Brown, the grantee of the reservation had, he derived under the treaty and from the'United States by virtue of the treaty, and not from any prior and better right residing in the Indian nation by virtue of the treaty of 1777 or of any other treaty. If the treaty of 1785 or of 1791, meant to pass a right of property to the indians by the words forever, they had power to do so, and of course, they have done it, and have passed to them all the lands entered in John Armstrong’s office. But whoever thought so? The fact is universally admitted to be otherwise. They would have been void, like the entries on the south of Brown’s line, made in 1777 and afterwards; and never again would have revived. These were void because not allowed by North Carolina, but those in John Armstrong’s office were all valid, because made by the authority of North Carolina. Under the law of 1783, both the right of property and possession passed; for otherwise, why not sell the lands allotted to the Indians for their hunting grounds as well as those out of them? Why enlarge our bounds and reduce their’s to narrower limits, but to the end, that both the right of property and possession might pass to the grantee? They both passed, in the contemplation of the North Carolina legislature, and the right of possession was only suspended for a time, by the treaty of 1785; and this not without great dissatisfaction to the people of North Carolina and the claimants under her, who pre *160 sented to Congress very strong remonstrances; and some of them claimed compensation, because, by the treaty, their enjoyment was postponed.
These are the doctrines hitherto maintained in all our public acts, and which have been lately recognized in the Supreme Court of the Union: and who can foresee the consequences which may follow the adoption of different sentiments at this day? These consequences may be very pernicious; it is best to adhere to the rules which our ancestors have laid down on this all-important subject. These Indians made treaties with Spain in 1782 and 1784. If their right of property or possession be now admitted, we may be involved in difficulties, either by means of those treaties, or some other treaties or deeds which they may have made before their cessions to us. They have dealt with the French, English, Spaniards, and with the subjects of all of them. If it be once ad" mitted that their territorial rights are distinct from, and prior to, those of the state in whose limits they are, we may, in the end, be obliged likewise to admit the validity of their treaties as deeds. For it will be inconsistent to say that they have absolute rights which they cannot transfer to others, as' they can their personal property. With respect to the country they inhabit, it is ours, and they possess it subject to such laws made by ourselves to prevent mischiefs from alienation, as we choose to make, without their consent; which laws of restriction may be enlarged at pleasure, to prevent any other evils which may be apprehended from their uncontrolled use of the territory, as well as that of alienation, to nations, companies or individuals, not purchasing by public authority. How can it be said that one has a right of property or possession, which another may regulate and limit at any time and to any extent that he may think proper?
Could they, by virtue of their treaties, have sold their lands to foreign nations? Could they have contracted with foreigners that they mightbuild forts upon them? Or have stationed their troops in their territories? Or could they make any treaties with foreigners to give them pos *161 session of these lands for any purpose whatever, without doing an injury to North Carolina, for which these Indians might justly be expelled from the country? The treaties then operated as an estoppel to the people of North Carolina, from using their rights for the present, ■without impairing, in any degree, the rights which they had by the King’s charter, by the declaration of independence, and by their own constitution, which asserted the dominion and sovereignty of the Indian lands to be in the people of North Carolina. There was no power given to Withdraw them by treaty from under this dominion and sovereignty, nor was the treaty ever supposed by the people of North Carolina, to have had such effects. Good policy demanded, that the Indians should not be displeased, and so long as this policy continued, North Carolina did not think proper to use her rights of taking possession. The treaty of 1777, therefore, imposed upon North Carolina no obligation not to dispose of the Indian country within her limits, whenever it became necessary for the good of the State. Of the same nature were the treaties of 1785 and 1791. They agreed that North Carolina and the United States should suffer the occupancy of the Indians to remain undisturbed, subject to all the public and individual rights to which the territory was subject; which, however, by force of the treaty, should not be put into present operation; as if A owed B one hundred dollars, and by covenant under his seal, would agree not to sue B till the end of six months after the debt became payable: or if A was tenant at sufferance to B, and the latter, for the accommodation and benefit of A, should covenant not to turn him out of possession, so long as B could conveniently do without the use of the farm which A occupied. It was not the meaning of the treaty of 1785 or of 1791, to give the Indians a right of dominion over the soil; nor even to suspend a right of possession, except for such time only as circumstances required that the right of possession should not be exerted. The grant to Stuart, therefore, was a valid *162 grant, notwithstanding the obstructions which these treaties might be supposed to throw in the way.
The next question is, supposing the grant to Stuart to be valid, could the land contained in it be passed by the treaty of 1819 to Brown, to whom it was granted by that treaty?
It is said, indeed, that contracts made with Indians, are not treaties, which are to be the supreme law of the land, but entered into under the clause which vests the power in Congress, to, regulate trade and intercourse with the Indian tribes. Then the consequence would be, that Congress composed of both branches of the legislature, should ratify all such treaties; whereas, the fact is, that all Indian treaties are ratified by the Senate, as treaties with foreign nations are. It must be considered as a treaty, possessing all the qualities attributed to it by the constitution of the United States. It is said that the cession act of 1789, is a treaty, and must have the same forceas any other treaty; and that rights acquired under it, cannot be affected by subsequent treaties. The rule alluded to is a proper one, but misapplied on the present occasion. If, by treaty, an exclusive right be given to France, and the same exclusive right be after-wards given to England, Erance has the better right: for the rights belonging to her cannot be taken away without her consent, and given to another. But if all the people of the State, including the person whose right is to be given up, agree with all the people of another State or empire, that the rights of a certain individual shall be surrendered and extinguished, the same shall be done accordingly; for the person to suffer is one of the contractors for the sacrifice to be made; and this is a distinct case from that of private rights, taken by the legislature, where the constitution forbids the legislature to do so. For there the whole people have agreed with the individual, that his rights shall be safe; and his consentís not given, as in the case of a treaty, that his right shall be abandoned, and when the legislature acts against it, it does so without his consent,and without the consent of the *163 whole people, who have agreed to protect him. ever North Carolina has stipulated in the cession act, for the safety of the grantees, both she and they, as a part of the United States, and in concurrence with the United States, have agreed to give up. So that there is on one hand, the whole people of the Union, including the grantees, consenting to give up the private rights of the grantees, and they themselves have subscribed the deed for that purpose. Not so with the legislative act made without their consent, and without authority by the nation. That is the act only of the major part of the individuals who compose the assembly; whatever then is stipulated in the cession act, in favor of Stuart himself, has been yielded by the treaty of 1819, in which he was an agent and partaker.
It is said, that a treaty cannot make aliens to be citizens; but the people of Louisiana and Florida were made citizens by treaties. It is said that territorial rights cannot be surrendered; but a part of Louisiana was surrendered as part of the consideration for Florida. It is said that vested rights cannot be affected by treaty; but the debtor in North Carolina, to British creditors, who paid his money into the treasury, to which it was confiscated by an act of the legislature, and who, on such payment, had a full and formal discharge given to him by the State, was compelled to pay the same debt over again to the British creditor, because, in the treaty of peace, it was “agreed that creditors on either side, shall meet with no lawful impediment to the recovery of the full value, in sterling money, of all lona Jide debts heretofore contracted.” If the debt was heretofore contracted, though in the mean time, the State had legally discharged the debtors, the treaty took from him his legal discharge, and held it lor nothing. So in Virginia, where the debts had been sequestrated and paid into the treasury, and a receipt given by the State against the debt. It was only inquired, whether he had been a bona Jide creditor before the date of the treaty; and all interven *164 ing releasements, however legal they might be, were prostrated in presence of the treaty.
These practical instances, show some things that a treaty can do; and without going into the inquiry, what a treaty cannot do, it is perceivable that it can do the material things which the treaty of 1819, has contracted for. It can make an Indian to be a citizen, and can give to him the vested rights of another. And in these very instances, the compensation to be made for private property, taken fop public uses, is not a condition precedent upon which the validity of the treaty depends, but is a matter between the Slate that makes the treaty, and the individual citizen whose property is taken away by it; and here it is tobe remarked, that the amendment of the constitution is a plain admission of the right of the sovereign power to appropriate private property to public uses where the public good demands it.
The theory of treaties and of the effects produced by them, are not less indicative of the same conclusions. The constitution, which gives the power to make treaties, does, in every state or empire, mark the extent of their operation. If the power be given without limitation, whatsoever the people collected into one great assembly can do, their organs can do likewise. But if restricted to certain specified subjects, it cannot meddle with others. The nations who contract with each other, must know how far they are permitted to go, and must not act upon subjects not within their authority. A nation, like an individual, is not bound beyond the authority it gives. When not forbidden by the constitution, it may give away private property or private rights: (Vattel, B. 1, ch. 20, sec. 241, 242, 243, 244;) and the whole nation must make compensation. Treaties are more forcible upon this subject than the legislative power, because there is more danger to be' incurred from the inexecution of treaties, than from an act of injustice at home; for at some time or other this latter can be corrected — and yet"the Legislature can make use of private property for public uses, when the public exigencies render it necessary, though *165 it may be utterly prohibited to the Legislature to take the properly of one man and give it to another. This latter measure, when practised by the Legislature, no plea of necessity can justify; and, therefore, it is not allowed on any pretence whatever. But for. public uses, the Legislature may have recourse to private property; and of this we have a memorable instance in the war of the revolution. The treasury being exhausted, the law authori-sed the impressment of horses, wagons, arms, provisions, and, in short, of all things which the public service called for; and these impressments were continued to the end of the war. But for them, it could not have been maintained. Such a right, if it may be exercised by the Legislature, can, with much more propriety, be exercised by the treaty-making power. It is equally the organ of the people, and can bind them to the extent that existing circumstances may render advisable, in the same manner that any other can by the acts which it is permitted by the constitution to perform. The one is as much the act of the nation as the other: And it is proper that treaties should be supreme above all other laws. Shall it be allowed to the State Legislatures, by their acts, to oppose and prevent the executing a treaty in which the whole Union is interested? Suppose when a treaty provides for the payment of debts, a State Legislature should declare by an act for the purpose, that the citizens of their state should not be compelled to pay them, or that such debts should not be collected in that state. Must the whole Union, because of the misconduct of one state, be forced into a war? The treaty also should be a law, operating immediately and directly upon the people. If the State Legislatures must be applied to, to pass laws for the execution of treaties, which are in any respect burthensome, they will never do it. Congress applied to the State Legislatures to pass laws for the execution of the fourth article of the treaty of peace, from 1783 to 1787, and no law was ever made for the purpose. The British nation complained, and was nearly driven into a war, because of the inexecution of the treaty; and finally, the United *166 States would have been involved in war, had it not been for the timely formation of the Federal Constitution, and the declaration contained therein, that treaties should be the supreme law, above all laws and obstructions which could stand in the way. In the United States, the unsullied honor of the nation, and the complete performance of all that it stipulates, is one of the great objects which the constitution proposes to perfect..
From this view of the case, it is seen that practice, theory, and principle, all unite in deciding that a treaty may, if it think proper, make an Indian a citizen, and vest in him a part of the Indian territory, to be held in fee simple, though such part of the territory may, at the time, be vested by a previous grant in another, who is a citizen. To the treaty he is a party consenting; to a law of the Legislature he is no party. In the treaty, he is an agent; in the law, a patient. Upon Stuart it may seem to weigh heavily; but if the law were not so, how would others be affected? The treaty would be void for want of performance on the part of the United States; and all granted lands must again be subjected to Indian occupancy, which, by this treaty, were discharged from the Indian incum-brance. Is it better that many should suffer for the benefit of one, or that they should remain quiet, and he be forced to get reimbursement from the United States, who are able to make to him full compensatiori, and are bound to do so by the express words of the amendment to the constitution.
We come lastly to enquire into the title which Brown has by the grant of the reservation. We should determine only those points, which are necessary for the final decision of this cause, and not those likewise, without which, the cause can be settled. The defendant is in actual possession; it is a legal possession, and with it he has an estate either for life or in fee, and if either be determinable on the contingency of removal, that event had not occured when the suit was commenced and so his estate whatever it be, is a subsisting estate.
Judgment reversed and the cause remanded to be be tried de novo.