## UNITED STATES v. BRITISH SCHOONERS.*

### (District Court, Sitka. 1887.)

1. FISH ☞9—FUR SEALS—ACT OF CONGRESS.

    The act of Congress of July 27, 1868 (15 Stat. 241, c. 273, § 6), in relation to the protection of seal life in Alaskan waters, is not in conflict with the Constitution of the United States.

2. INTERNATIONAL LAW ☞6 — TREATIES — BERING SEA — MARE CLAUSUM.

    The United States purchased and acquired all the title Russia had to that portion of Bering Sea described in the treaty of March 30, 1867 (15 Stat. 539), including the whole group of the Aleutian Islands. Russia had acquired title to the sea by right of discovery as far back as 1741, and this right was recognized by both Great Britain and the United States by the treaties of 1824 (April 17, 1824, 8 Stat. 302) and 1825.

3. ESTOPPEL ☞62(1)—TREATIES ☞7—CONTRACTS.

    The law of estoppel in certain cases applies to nations as to individuals. Nations, like individuals, have the right of contracts, and their treaties are subject to the same rules of interpretation. Great Britain and her Dominion government, of which British Columbia is a part, are estopped from any claim of right to take fur-bearing animals in that part of Bering Sea which is bounded by the lines set forth in the treaty of March, 1867; her treaty with Russia of 1825 having expired.

4. TERRITORIES ☞8—TREATIES ☞7—CONSTITUTIONAL LAW.

    The courts have power to interpret treaties, and when made they should be held sacred, and are a part of the supreme law of the land. Congress recognized the validity of the treaty by extending the laws in relation to customs, commerce, and navigation to and over all the waters of Alaska.

A. K. Delaney, of Juneau, for the United States.
M. W. T. Drake, Q. C., for the vessels.

DAWSON, District Judge. The libel of information in the case of the schooner Dolphin is similar to the informations filed against the other schooners named, and alleges that on the 12th day of July, 1887, the commanding officer of the United States revenue cutter Rush seized the schooner Dolphin in that portion of Bering Sea which was ceded to the United States by Russia in the treaty of March, 1867; that said schooner was violating section 1956 of the

☞See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Alaskan Reports, Haydon, 1888, vol. 1, p. 53.

Revised Statutes (U. S. Comp. St. 1916, § 8850) in relation to the protection of seal life in the waters of Alaska. To the libel of information the queen's counsel of British Columbia filed a demurrer, alleging that the District Court of Alaska had no jurisdiction over the subject-matter of the action, for the reason that the schooner was more than one marine league from the shore when seized, and that the act of Congress of July 27, 1868, is unconstitutional, in that it restricts free navigation of the Bering Sea for sealing purposes. A stipulation signed by the queen's counsel, Mr. M. W. T. Drake, upon the part of the British owners, and Mr. A. K. Delaney, upon the part of the United States, was filed, in which it was agreed and conceded that the masters of the vessels named were taking fur seals in that portion of Bering Sea which is claimed by the United States under the treaty with Russia of March, 1867.

The issue as presented involves an examination of a most pertinent and critical question of international law. It will be necessary to ascertain, first, the right of the Imperial government of Russia to the Bering Sea, anterior to the treaty of March, 1867, and for information upon this subject I am largely indebted to Mr. N. L. Jeffries for a collection and citation of authorities and historical events, and for the want of books at my command upon this question I am compelled to rely for historical facts upon his carefully prepared brief. From this elaborate brief I glean the following facts:

The sea of Kamchatka, or Bering Sea, is a large estuary of the North Pacific Ocean, or bay, and from the date of its discovery until the cession of Alaska to the United States was bordered on all sides by the territory of Russia, except the straits at the north leading to the Frozen Ocean, and the outlet in the southwest into the North Pacific.

In the early part of the eighteenth century, Peter the Great, of Russia, directed the fitting out of an exploring expedition to determine whether the continents of Asia and America joined, or were separated by the sea; also to discover if there were not an American Russia, as there was already an Asiatic and European Russia.

The expedition was commanded by Captain Bering, who set out from St. Petersburg, accompanied by officers, seamen, and shipbuilders, on the 5th of February, 1725; and after a perilous journey through Northern Siberia he reached Kamchatka,

whence he sailed on the 20th of July, 1728, in a vessel named the Gabriel, which had been built at Kamchatka in accordance with instructions drawn up by the Emperor.

The first land discovered was the island of St. Lawrence, which he named in honor of the saint on whose day it was discovered. He continued northward until he reached what he supposed was the northeastern extremity of Asia, and was satisfied that the two continents were separated by the sea. Returning to St. Petersburg after passing through the sea and straits which bear his name, with a fixed opinion that there was a large body of land to the eastward, he aroused the spirit of discovery and induced his government to continue the explorations. He was created an admiral and placed in command of a new expedition; the senate, the admiralty, and the Academy of Science all united in aiding and encouraging the enterprise. This expedition, like the former, made the long and dreary journey across Northern Asia, and the Sea of Okhotsk to Kamchatka.

On the 4th of June, 1741, two well-appointed ships, the St. Paul and St. Peter, sailed in quest of new discoveries. On the 18th of July Bering first saw the continent of America in latitude 50 deg. 28 min. See Muller's Voyages from Asia to America; Steller's Diary, page 190.

According to his instructions, after reaching the American coast, he was to steer southward to the 45th parallel, and then return to the north, crossing back to Asia at Bering Strait. Bancroft's History of Alaska, page 54.

During this expedition, Bering sailed as far south as 45 deg. north latitude, and after making many discoveries his ship was finally wrecked near the island which bears his name, and on which he died on the 8th of December, 1741.

The enterprising spirit of Russian merchants and traders even in Siberia was awakened by the accounts given of the industries that might be created and the innumerable fur-bearing animals which inhabited the waters and islands in and adjacent to what is now known as Bering Sea. Owing to a conflict of interests, disorder, and a wanton destruction of seal life in the waters and on the islands of the new discoveries, an imperial ukase was issued, bearing date of December 27, 1799, by which the right of fishing, hunting, and trading was conferred upon what was designated the "Russian American

Company." In the ukase of that date Russia asserted a distinct claim, by right of discovery, to the western part of America, beginning from the 55th degree of north latitude, and of the chain of islands extending from Kamchatka to the north to America and southward to Japan. Authority was also given to the company to have exclusive use of all hunting grounds and establishments then existing on the northeastern (western) coast of America, from the 55th degree of north latitude, but farther to the south, and to occupy the new lands discovered as Russian possessions. It will be observed from the foregoing that Russia claimed the exclusive right and dominion of the Sea of Kamchatka, now known as Bering Sea, by right of discovery, and for the further reason that the sea was bounded by Russia's Asiatic coast on the west, to Bering Straits on the north, and on the American continent as far east as British possessions, and south to 54 deg. 40 min. north latitude, and was essentially landlocked by Russian territory.

Now, in relation to this question of title acquired by discovery, our own court of last resort has held in the case of Johnson v. McIntosh, 8 Wheat. 572, 5 L. Ed. 681, Marshall, C. J., delivering the opinion, that:

"On the discovery of this immense continent, the great nations of Europe were eager to appropriate to themselves so much of it as they could * * * acquire. * * * But as they were all in pursuit of nearly the same object, it was necessary, in order to avoid conflicting settlements, and consequent war with each other, to establish a principle, which all should acknowledge as the law by which the right of acquisition, which they all asserted, should be regulated, as between themselves. This principle was that discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession. The exclusion of all other Europeans necessarily gave to the nation making the discovery the sole right of acquiring the soil from the natives, and establishing settlements upon it. It was a right with which no European could interfere. It was a right which all asserted for themselves, and to the assertion of which, by others, all assented. * * *" See Wharton's Digest International Law, vol. 1, § 2.

Chancellor Kent says:

"All that can be reasonably asserted is that the dominion of the sovereign of the shore over the contiguous sea extends as far as is requisite for his safety and for some lawful end." 1 Kent's Commentaries, page 28.

Vattel says:

"A nation may appropriate to herself those things of which the free and common use would be prejudicial or dangerous to her. This is a second reason for which governments extend their dominion over the sea along their coasts, as far as they are able to protect their rights." See Vattel's Law of Nations, 127.

Supplementing the principle enunciated by Chief Justice Marshall, supra, with the rule as stated by Kent and Vattel, can there longer exist a doubt as to Russia's title to the Bering Sea and the extended group of the Aleutian Islands?

The queen's counsel lays much stress in his argument upon the fact that both the United States and Great Britain treated with Russia (the United States in 1824, and Great Britain in 1825) in relation to the free use of the waters of the Bering Sea, and it is claimed that by these treaties the sea was thrown open as the common property of mankind. But an examination of these treaties and the objects in view by the three great powers fail to warrant the conclusion reached in the argument. The principal parts of the treaty between the United States and Russia, the treaty between Great Britain and Russia being similar, are thus set forth by Professor Wharton (see 1 International Law Digest, § 32):

"Article 1.—It is agreed that, in any part of the great ocean, commonly called the Pacific Ocean or South Sea, the respective citizens or subjects of the high contracting powers shall be neither disturbed nor restrained, either in navigation or in fishing, or in the power of resorting to the coasts, upon points which may not already have been occupied, for the purpose of trading with the natives, saving always the restrictions and conditions determined by the following articles.

"Article 2.—With a view of preventing the rights of navigation and of fishing exercised upon the great ocean by the citizens and subjects of the high contracting powers from becoming the pretext for an illicit trade, it is agreed that the citizens of the United States shall not resort to any point where there is a Russian establishment, without the permission of the governor or commander, and that, reciprocally, the subjects of Russia shall not resort, without permission, to any establishment of the United States upon the northwest coast.

"Article 3.—It is moreover agreed that, hereafter, there shall not be formed by the citizens of the United States, or under the authority of the said states, any establishment upon the northwest coast of America, nor in any of the islands adjacent, to the north of fifty-four degrees and forty minutes of north latitude, and that, in the same manner, there shall be none founded by Russian subjects, or under the authority of Russia, south of the same parallel.

"Article 4.—It is, nevertheless, understood that during a term of ten years, counting from the signature of the present convention, the ships of both powers, or which belong to their citizens or subjects respectively, may reciprocally frequent, without any hindrance whatever, the interior seas, gulfs, harbors, and creeks, upon the coast mentioned in the preceding article, for the purpose of fishing and trading with the natives of the country.

"Article 5.—All spirituous liquors, firearms, other arms, powder, and munitions of war of every kind, are always excepted from this same commerce, permitted by the preceding article, and the two powers engage, reciprocally, neither to sell nor suffer them to be sold, to the natives by their respective citizens and subjects, nor by any person who may be under their authority. It is likewise stipulated that this restriction shall never afford a pretext, nor be advanced, in any case, to authorize either search or detention of the vessels, seizure of the merchandise, or, in fine, any measures of constraint, towards the merchants or crews who may carry on this commerce; the high contracting powers reciprocally reserving to themselves to determine upon the penalties to be incurred, and to inflict the punishments in case of the contravention of this article by their respective citizens or subjects."

Nations, like individuals, have the right of contracts, and their treaties are subject to the same rules of interpretation and of morality which govern in municipal law. 1 Bouvier Law Dictionary, 741.

"Estoppel" in law is a term the etymology of which implies the preclusion of a person from asserting a fact by previous conduct, inconsistent therewith, on his own part or on the part of those under whom he claims. It is in law a prohibition which denies a man the right of alleging or denying a fact in which he has with full knowledge long acquiesced. Stephen's Plead. 239. See Vattel on the Law of Nations, §§ 286 and 294. Applying this rule, the conclusion cannot be escaped that in consequence of the acquiescence of Great Britain in the claim, jurisdiction, and dominion of Russia to what is now known as Bering Sea since the expiration of the treaty of Russia and Great Britain in 1825, which was to exist for ten years, Great Britain and her Dominion government, of which British Columbia is a part, are estopped from any claim of right or privilege of taking fur-bearing animals in Bering Sea east of the line mentioned as our western boundary in the treaty, and which is recognized as the line dividing the continents of Asia and North America.

The western boundary line of the United States as agreed

upon by the United States and Russia in the treaty of March, 1867, is as follows:

"The western limit within which the territories and dominion conveyed, are contained, passes through a point in Bering's Straits on the parallel of sixty-five degrees thirty minutes north latitude, at its intersection by the meridian which passes midway between the islands of Krusenstern, or Ignalook, and the island of Ratmanoff, or Noonarbook, and proceeds due north, without limitation, into the same Frozen Ocean. The same western limit, beginning at the same initial point, proceeds thence in a course nearly southwest, through Bering's Straits and Bering's Sea, so as to pass midway between the northwest point of the island of St. Lawrence and the southeast point of Cape Choukotski, to the meridian of one hundred and seventy-two west longitude; thence, from the intersection of that meridian, in a southwesterly direction, so as to pass midway between the island of Attou and the Copper Island of the Kormandorski couplet or group in the North Pacific Ocean, to the Meridian of one hundred and ninety-three degrees west longitude, so as to include in the territory conveyed the whole of the Aleutian Islands east of that meridian." See Public Treaties, page 672.

The courts have the same right and power, when called upon to interpret a public treaty, to derive aid from contemporaneous interpretation, and by ascertaining the intention of those whose duty it is, under the Constitution, to make treaties, as they have in the interpretation of any other law. What, then, was the object in purchasing Alaska? Manifestly to extend our northwest boundary line so as to include the whole group of the Aleutian Islands.

Senator Sumner, who was chairman of the committee on foreign affairs in the Senate of the United States at the time of the Alaska purchase, and after the boundary line had been agreed upon, defined it is as follows:

"Starting from the Frozen Ocean, the western boundary descends Bering Straits midway between the two islands of Krusenstern and Ratmanoff to the parallel of 65 deg. 30 min., just below where the continents of America and Asia approach each other the nearest; and from this point it proceeds in a course nearly southwest through Bering Straits midway between the island of St. Lawrence and Cape Choukotski, to the meridian of 172 deg. west longitude, and thence in a southwesterly direction, traversing Bering Sea midway between the island of Attau on the east and Copper Island on the west, to the meridian of 193 deg. west longitude, leaving the prolonged group of the Aleutian Islands in the possessions now transferred to the United States, and making the western boundary of our country the dividing line which separates Asia from America. In the Aleutian range, besides innumerable islets and rocks, there are not less than fifty-five

5 A.R.—2

islands exceeding three miles in length; there are seven exceeding forty miles, with Ounimak, which is the largest, exceeding seventy-three miles. In our part of Bering Sea there are five considerable islands, the largest of which is St. Lawrence, being more than ninety-six miles long." See Ex. Doc. No. 177, 40 Cong., 2d Sess., page 125.

Indicating most clearly what was the understanding in the United States Senate at the time as to our western boundary.

Subdivision 2 of section 2 of article 2, of the Constitution, in defining the powers of the President, says:

"He shall have power, by and with the advice and consent of the Senate, to make treaties, provided two-thirds of the Senators present concur."

Judge Story, in considering this clause of the Constitution, says:

"It will be observed from this that the power to make treaties is by the Constitution general, and of course it embraces all sorts of treaties for peace or war, for commerce or territory." See Story on the Constitution, § 1508, and authorities there cited.

It is argued that this question belongs to the political department of the government and that it should be there adjusted; but this position is, I think, wholly untenable, at least at this stage of the controversy.

The second clause of the sixth article of the Constitution declares that:

"This Constitution, and the laws of the United States, which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

Judge Story, in commenting on this section, forcibly says:

"The propriety of this clause would seem to result from the very nature of the Constitution. If it was to establish a national government, that government ought to the extent of its powers and rights, to be supreme. It would be a solecism to affirm that a national government should exist with certain powers, and yet that in the exercise of those powers it should not be supreme.

"In regard to treaties, there is equal reason why they should be held when made, to be the supreme law of the land. It is to be considered that treaties constitute solemn compacts of binding obligation among nations; and unless they are scrupulously obeyed, and enforced, no foreign nation would consent to negotiate with us; or if it did, any want of strict fidelity on our part in the discharge of

the treaty stipulations would be visited by reprisals, or war. It is, therefore, indispensable that they should have the obligation and force of a law, that they may be executed by the judicial power, and be obeyed like other laws." See Story on the Constitution, § 1838.

Congress recognized the right of the United States to the whole of the new acquisition by appropriating $7,200,000 to pay for the new territory, and on the 27th day of July, 1868, extended the laws of the United States relating to customs, commerce, and navigation over all the main lands, islands, and waters of the territory ceded to the United States by the Emperor of Russia. See Revised Statutes, § 1954. Showing unmistakably the understanding of the government at the time as to what had been acquired, and that our boundary line was located at the 193d degree of west longitude. The longitude of a place is the arc of the equator intercepted between the meridian passing through that place and some assumed meridian to which all others are referred. Different nations have adopted different meridians. The English reckon from the Royal Observatory at Greenwich; the French from the Imperial Observatory at Paris; and the Germans from the Observatory at Berlin, or from the island of Ferro. In the United States we sometimes reckon longitude from Washington, and sometimes from Greenwich. See Loomis' Elements of Astronomy. But in establishing the western boundary line of Alaska the reckoning of longitude was from Greenwich, which reaches the line dividing the continents of Asia and North America. See article 1 of the Treaty of March, 1867.

The purchase of Alaska was unquestionably made with a view to the revenues to be derived from the taking of fur seal in the waters of Bering Sea, and especially on the islands of St. Paul and St. George, both of which were by act of Congress of March 3, 1869, made "a special reservation for government purposes." See 15 Stat. 348. Secretary Seward was a skilled diplomat, a learned man in statecraft, and he evidently foresaw the income to be derived by the government from the seal industry on and adjacent to those islands. Hence in the negotiation he insisted upon and Russia conceded that our boundary line should be extended to the meridian named in the treaty. The industry and consequent revenues would be hopeless without the residuary power of the United States to protect and regulate the taking of fur-bearing animals, the continuation of which can but result in the wanton destruc-

tion of the rookeries, the most valuable in the world, is a legitimate exercise of the powers of sovereignty under the law of nations, with which no nation can lawfully interfere. The question of the constitutionality of the act of Congress of July 27, 1868 (Revised Statutes, p. 343), scarcely deserves notice, since it has been sustained by this court. See United States v. Nelson (D. C.) 29 Fed. 202. See same case, affirmed by the United States Circuit Court for Oregon, 30 Fed. 112. See, also, The Louisa Simpson, 2 Sawyer, Fed. Cas. No. 8,533.

The conclusion I have reached is that the demurrer must be overruled; and it is so ordered, and that judgment of forfeiture to the United States be entered against each of the vessels separately, together with their tackle, apparel, furniture, and cargoes, saving to the masters and mates their private property, such as nautical instruments and the like, and that a stay of proceedings for 90 days be granted as per stipulation filed.