By the Court.—Truax, J.
The learned counsel for the appellants contend in this case, as they have often contended in other cases of a like nature, that prior to 1664 the land included in the Bowery was owned absolutely in fee by the Dutch government of this island ; and that, for that reason, abutting property owners had and have no right or interest in the land embraced within the limits of the street on which their premises abut.
I shall show that the Dutch never owned the fee *260 in the street, and that it never was admitted by the English government that they did own the fee in the street.
The civilized powers of Europe claim America by the right of discovery, and it was the international law of the time that the absolute rights of property and dominion to the soil of this country belonged to the European nation by which that particular portion of the country was first discovered. Martin v. Waddell, 16 Peters U. S. Repts. 367; Story on the Constitution, § 1 and 2.
The English always claimed this portion of North America by right of the prior discovery of this country by John and Sebastian Cabot. The elder Cabot, who, at that time, was in the employ of Henry VII. of England, reached the main land before Columbus himself. The English claimed, and began to claim shortly after this time, that the Cabots had visited the whole coast from Florida up to Labrador,vahd had thus acquired for England a title which super-ceded that of Spain.
It is stated in the account of Gilbert’s voyage, which is contained in Hakluyt’s collection of Voyages, which account was written by Mr. Edward Hayes about the year 1583, that “the first discover^ of these coasts (never heard of before) was well begun by John Cabot, the father, and Sebastian his son, an Englishman born, who were the first finders out of all that great tract of land stretching from the Cape of Florida unto those islands which we now call the new-found-land, all which they brought and annexed unto the crown of England.” * * * It is also stated, that, “ not long after Christopher Columbus had discovered the island and continent of the West Indies for Spain, John and Sebastian Cabot made discovery also of the rest from Florida northwards to the behoof of England. Then, seeing the English nation only hath right unto these conn *261 tries of America from the Cape of Florida northwards by the privilege of first discovery, unto which Cabot was authorized by regal authority, and set forth by the expense of our late famous King, Henry VII., which right also seemeth strongly defended on our behalf by the powerful hand of Almighty God, notwithstanding the enterprises of other nations, it may greatly encourage us upon so just ground, as is our right, and upon so sacred an intent, as to plant religion (our right and intent being meet foundations for the same) to prosecute effectually the full possession of those so ample and pleasant countries appertaining unto the crown of England.”
The extract from Hakluyt that I have given may be found in Voyages of the Elizabethan Seamen to America, edited by E. J. Payne, printed in London in 1880.
In 1496, on the 5th of March, a patent was issued by Henry VII., licensing John Cabot and his three sons, or either of them, their heirs or assigns, to search for islands, provinces or regions in the eastern, western or northern seas, and as vassals of the King, to occupy the territories that might be found, with an exclusive right to their commerce on paying the King a fifth part of all profits. It was while acting under this license that Cabot is said, to have discovered the continent of North America.
In 1498 Sebastian Cabot sailed westward until he came to what is now Newfoundland. From there, he proceeded to the main land, made several landings, dealt with the natives, and followed the coast southward, probably as far as the Chesapeake Bay. '
Things remained in this state until the latter part of the sixteenth century, when certain concessions were made to Walter Raleigh and others.
In 1606 James I. granted a charter, the first colonial charter, under which the English were planted in America. By that charter the territory *262 from Cape Fear to Halifax, excepting, perhaps, a little spot in Acadia then actually possessed by the French, was set apart to be colonized by two rival companies.
At this time the Dutch had made no voyage to America, except that, in 1597, they trafficked with the West Indies. In fact, it is stated in Wassenan’s Historie van Europa, Amsterdam, 1621, that “ numerous voyages realized so much profit for the adventurers that they discovered other countries which they afterwards settle and plant. Virginia, a country lying in 42£ degrees, is one of these. It was first peopled by the French, afterwards by the English, and is to-day (1624) a flourishing colony. The Lord’s States General observing the great abundance of their people as well as their desire to plant other lands, allowed the West India company to settle that same country.”
Between 1609 and 1622 the Dutch traded with the Indians in this country, and had a trading post on Manhattan Island.
In the year 1620 James I. issued a new patent conferring on the patentees in absolute property with unlimited jurisdiction, the territory from the fortieth to the forty-eighth degree of north latitude, and in length from the Atlantic to the Pacific. “ Without the leave of the Counsel of Plymouth not a ship might sail into a harbor from Newfoundland to the latitude of Philadelphia ; not a skin might be purchased in the interior ; not a fish might be caught on the coast ; not an emigrant might tread the soil.” (Bancroft’s History of America, Chapter 8.)
In 1622 the Dutch took measures looking towards planting a colony here, and in that year the English minister at the Hague demanded that the enterprise of planting a Dutch colony upon the Hudson should be abandoned. This demand or request of' the English Minister was disregarded, but in 1627 Governor *263 Bradford of Plymouth gave notice to Peter Minuet, the then Governor of New Netherlands, that the patent of New England extended to latitude 40, and that the Dutch had no right to plant and trade north of that line. At the very time that the Dutch settled on Manhattan Island, the English had flourishing colonies, one southwards on the James River, the other northwards at Plymouth. “ Colonization on the Hudson,” says Bancroft, in his History of the United States, chapter 15,—“ was neither the motive nor the main object of the' establishment of the Dutch West India countries. The territory was not described either in the charter or at that time in any public Acts of the States General which neither made formal, specific grant nor offered to guarantee the possession of a single foot of land.”
In 1632 the ship in which Governor Minuet embarked for Holland was driven into Plymouth by the weather, and was there detained for a time on the allegation that it had traded without license in a part of the dominions of the king of England interloping between the plantations of Virginia and New England. (Valentine’s History, p. 152.)
In 1663 Governor Stuyvesant went to Boston to complain of the encroachments made by the people of Massachusetts and Connecticut, to remonstrate against such encroachments. In the words of Bancroft from the chapter above cited, “ an embassy to Hartford renewed the language of remonstrance with no better success. Did the Dutch assert their original grant from the States General, it was interpreted as conveying no more than a commercial privilege. Did they plead discovery, purchase from the natives and long possession, it was replied that Connecticut by its charter extended to the Pacific. Where, then, demanded the Dutch negotiators, where is the New Netherland ? and the agents of Connecticut with provoking indifference replied, ‘ we don’t know.’ ”
*264 On the 12th of March, 1664, certain letters patent duly executed were granted by Charles II., king of England to James, Duke of York. These letters patent stated “ for divers good causes and considerations us moving thereunto, and having of our special grace, * * * given and granted, and by these presents, for us, our heirs and successors, do give and grant unto our dearest brother, James, Duke of York, his heirs and assigns, all that part of the main land of New England, beginning at a certain place called or known by the name of St. Croix, next adjoining to New Scotland in America, * * * * And also, all that island or islands commonly called by the several name or names of Matowacks or Long Island, situate, lying and being towards the west of Cape Cod, and the Narrow Higansetts, and abutting upon the mainland, between the two rivers there, called or known by the several names of Connecticut or Hudson rivers. Together also with the said river called Hudson river, and the lands from the west side of Connecticut to the east side of Delaware Bay, * * * * together with all the lands, islands, * * * * to have and to hold, all and singular the said lands, islands, hereditaments and premises, with their, and every of their appurtenances, hereby given and granted, or herein before mentioned, tobe given and granted, unto our dearest brother, James, Duke of York, his heirs and assigns forever ; to be holden of us, our heirs- and successors, as of our manor of East Greenwich, in our county of Kent.”
This grant was confirmed to the Duke of York by a subsequent grant from King Charles II., dated the 29th day of June, 1674, which was made for the purpose of removing doubts which had then arisen as to the validity of the first. It was provided in these grants that the statutes, ordinances, etc., established by the Duke of York, should not be contrary to, but *265 as nearly as might be agreeable to the laws, statutes and government of the realm of England.
Such was the condition of affairs, and such the claims made by the English up to and at the time they took possession of what was then known as New Netherland, The English commissioners in their letter to Governor Stuyvesant demanding possession of Manhattan Island say, that the right of the king of England to the land occupied by the Dutch was unquestionable. In other words .they demanded the country because it belonged to the English and not to the Dutch.
It is stated in chapter 3, section 6, of Harris’s voyages, published at London in 1705, that the colony of New York was English by a double right, namely, the right of discovery and. of conquest. It was, says the writer, undoubtedly part of the country, the coasts of which were first viewed by Sebastian Cabot, and as such made a part of the original provvince of Virginia, and was afterwards within the limits of the country granted by King James to the Western Company, but before it could be settled the famous navigator, Hudson, discovered that river which has since borne his name, and the country adjacent, which he afterwards sold to the Dutch who planted there ; but this was looked upon as illegal because they had not King James’ license, which, it seems, they afterwards obtained.
And Burke states in his account of the European settlement in America, (London 1760) that we, that is, the English, derive our rights in America from the discovery of Sebastian Cabot who first made the northern continent in 1497. The fact is sufficiently certain to establish our rights to our settlements in North America. And so it has been stated by Lossing in his .Encyclopaedia of United States History,—by Roberts in his volume on New York in the “ American Commonwealth ” series ; by Mr. *266 Fernow, the custodian of the Dutch records in the State Library in his article on New Netherland in the Narrative and Critical History of America ; also by Mr. Gerard in his titles to real estate, and by the supreme court of the United States in the case of Martin v. Waddell, 16 Peters, 408, where it is said: the right of the king to make this grant with all of its prerogatives and powers of government, cannot, at this day, be questioned. But in order to enable us to determine the nature and extent of the interest which it conveyed to the duke, it is proper to inquire into the character of the right claimed by the British crown in the country discovered by its subjects on this continent and the principles upon which it was parcelled out and granted,
The English possessions in America were not claimed by the right of conquest, but by the right of discovery, for according to the principles of international law as understood by the then civilized powers of Europe, the Indian tribes in the new world were regarded as mere temporary occupants of the soil, and the absolute rights of property and dominion were held to belong to the European nation by which any ^particular portion of the country was first discovered!"'
Whatever forbearance may have been sometimes practiced towards the unfortunate aborigines either from humanity or policy, yet the territory they occupied was disposed of by the governments of Europe at their pleasure as if it had been found without inhabitants.
The grant to the Duke of York, therefore, was not of lands won by the sword, nor were the government or laws he was authorized to establish intended for a conquered people.
It is true that this was said in reference to lands situated within the limits of the state of New Jersey, but it must be remembered that the Dutch not only *267 claimed what is now known as New York, but they also claimed the territory embraced within the present limits of the states of Delaware and New Jersey. Their ontposts in fact ran from the Connecticut river to the Delaware river. And for the reason that the Dutch claimed the territory which now makes part of New Jersey, the remarks of the supreme court of the United States in Martin v. Waddell, are as well applicable to land within New York as within New Jersey.
It was also stated in the case of Martin v. Wad-dell, that “the country mentioned in the letters patent was held by the king in his public and regal character as the representative of the nation and in trust for them. The discoveries made- by persons acting under the authority of the government were for the benefit of the nation, and the crown, according to the principles of the British constitution, was the proper organ to dispose of the public domains,—and upon these principles rest the various charters and grants of territory made on this continent.”
It is true that the Dutch, in 1629, bought or claimed to buy from the Indians, Manhattan Island, but this alleged purchase gave them no title ; for it has been held that a purchase from the Indians could not give a title,—and such a purchase cannot be recognized in the courts of the United States. Johnson v. McIntosh, 8 Wheaton, 543; United States v. Rillieux’s heirs, 14 Howard, U. S, 189.
The rule, however, is different-in Florida to which country the English never claimed title by right of discovery. They simply acquired their title to that land by treaty. 9 Peters, 712.
I am of the opinion that the fee of the Bowery and of the other streets in the city of New York that are known as Dutch streets, never was in the Dutch government, and that it was prior to the Revolution, *268 bound by the rules of the common law, and not by the rules of the Dutch civil law. While the Dutch were in actual possession the execution of the common law was suspended, just as during the late rebellion the execution of the laws of the United States could not be enforced in some of the Southern States. But, said the supreme court of the United States in Ketchum v. Buckley, 99 U. S. Rep. 188, “the same general form of government, the same general law for the administration of justice and the protection of private rights which had existed in the states prior to the rebellion, remained during its continuance and afterwards.”
The learned counsel for the defendants contend that by the Dutch civil law, streets and highways were owned absolutely by the State, and abutting owners had no private right or property in them whatever. Whatever may have been the terms of the Dutch civil law in that respect, I wish to call attention to an order made at a meeting of the Lord Director-General and Lord Councillors of New Netherland held on the 25th day of February, 1656. This order is the first order in point of time relating to the streets of New Netherland and presumptively was made in accordance with the laws that were then in force in New Netherland. This order is to be found in Yol. II. of the Records of the Burgomasters and Schepens, p. 362. This order recites that “ Having this day resumed the survey of the streets of the city as they heretofore, in the assembly of the Director-General and Councillors of New Netherlands, were designed in the map or plan, and laid out or set off into streets with palisades according to the same, the Director-General and Council confirmed forever the survey aforesaid, without changing the same. Therefore, the advancement of the same was referred to the Burgomasters of the city. They were directed to affix a notice and determine *269 a time at which all and any who might be abridged or injured by the aforesaid survey, should inform the Burgomasters of the extent of their damage, and to agree for the advantage of the city on the lowest price. If they could not agree, then to refer the same to two or three honest persons not interested.” The order also provided that the owners should remain in possession of the “ lots falling without the lines of the streets until they are paid therefor according to valuation.” This is very much like the modern method of taking property for street purposes. “ This,” says Gerard in his Treatise on the title of the Corporation to the streets, p. 129, “ raises the presumption, at least, that where land wa,s taken for a street, satisfaction to the owners had been made for the roadway taken, or- at any rate for the public easement established.” So it seems to have been considered at that time, for damages were awarded in 1656 and 1657 to various persons “ for what has formerly been cut off.” From this order and from these proceedings it seems clear that the authorities of New Netherland in 1656 and 1657 did recognize the private rights of abutting owners. And, therefore, if the Bowery was á street or road in 1656 or prior to 1664 the rights of an owner of property abutting on the Bowery were recognized by tips order. I have said “if the Bowery was a street or road in 1656 ” because the| evidence in the ease on that point is not very con 4 elusive. In fact no evidence on that point has been' presented to this general term. We have before us only two of defendant’s exhibits, the one the ground brief of Gov. Kieft in 1645, and the other the confirmation thereof by Gov. Nicols in 1667., It is true that in the grant by Gov. Kieft the “ Bouwery” is mentioned, but that word did not then mean what we know as the Bowery, but meant a farm. Mention is made in the grant of Panne *270 backer’s Bouwery and of Jacobsen’s Bonwery. The obligation of showing that the trial judge erred rests with the appellants. The alleged errors of the trial judge are presented to this court by exceptions "to the admission of testimony, and by exceptions to the charge of the trial judge and to the refusal to charge as requested by defendants.
Following the decision of this court in Abendroth v. Manhattan Railway Co., 54 N. Y. Super. Ct. 417, and for the further reasons assigned in this opinion, we are of the opinion that the trial judge did not err in charging that the plaintiffs had an easement of light, air and access. Of the same general nature is the right to put signs on a building, and the owner of property is injured in his property rights to a greater or lesser extent when such a right is taken from him.
The questions presented by the refusals to charge have been so frequently decided by this court adversely to the claim of the defendants, that it is not worth while to call the attention of counsel to the decisions; and so it is with regard to the questions presented by the exception to the testimony, showing that the owners of property mentioned in the complaint herein had paid assessments for paving the Bowery.
Certain questions were asked one of plaintiffs’ witnesses to which the defendants objected, and their objection, being overruled, excepted. These questions tended to show that the Bowery as now laid out was not a Dutch street or road. We are of the opinion that defendants were not hurt by this ruling. We said in Mortimer v. Metropolitan, Elevated, 54 N. Y. Super. Ct. 322, that the appellants were bound to show affirmatively that an error had been committed. In that case, as in this, exhibits were offered at the trial which were not produced on the argument before the general term, and we then *271 said in effect, that these exhibits “ may have of themselves been a sufficient ground for the ruling.” This case has lately been affirmed by the Court of Appeals.
The trial judge allowed, the defendants excepting, one of the witnesses called by plaintiffs to testify that a former tenant demanded, on the construction of the elevated railroad, a decrease in the rental that he was paying. The amount of the decrease was not shown and the trial judge told the jury at the request of the defendants, that they were “ not to consider for any purpose that abatement” of rent, and that they “ must • decide the question irrespective of that.” This we think caused the error in the ruling if there was any error.
The judgment and order appealed from are affirmed with costs.